Kenneth HELMAN, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 55, 2000.

Supreme Court of Delaware.

Submitted: April 3, 2001.
Resubmitted: Sept. 14, 2001.
Decided: Nov. 7, 2001.

Eugene J. Maurer, Jr., (argued), Nancy Jane Perillo, Wilmington, Delaware, for appellant.

John Williams, (argued), Kim Ayvazian, Deputy Attorneys General, Department of Justice, Georgetown, Delaware, for appellee.

BEFORE: VEASEY, Chief Justice, WALSH, HOLLAND, BERGER, and STEELE, Justices, constituting the Court en Banc.

WALSH, Justice:

In this appeal from the Family Court, we address the constitutionality of Delaware's Sex Offender Registration Statute as it applies to juveniles. The appellant contends that the sex offender registration and community notification scheme of 11 Del.C. §§ 4120 and 4121 infringes a liberty interest under the Fourteenth Amendment to the United States Constitution and Article I, § 9 of the Delaware Constitution, without providing procedural due process protection. He further asserts that, as retroactively applied to him, the disclosure provisions of § 4121 constitute punishment in violation of the Ex Post Facto Clause of the United States Constitution.

We conclude that the assignment of a convicted sex offender to a statutorily-mandated Risk Assessment Tier does not implicate a protected liberty interest under the State or Federal Constitution. We further conclude that the registration requirement does not run afoul of ex post facto protection and, as applied to juveniles, is a proper exercise of legislative policy. Accordingly, we affirm.

I

The appellant, Kenneth Helman,[1] although only 16 years of age at the time of his arrest, was indicted in the Superior Court on three charges of Unlawful Sexual Intercourse in the first degree. His charges were later transferred to the Family Court, as permitted under 10 Del.C. § 1101, where, after a two day bench trial he was adjudged delinquent of one charge of Unlawful Sexual Intercourse in the first degree.

The charges against Helman arose out of events that occurred two to three years prior to his arrest. At that time, Helman had sexual contact with a young child at a day care facility operated by his mother. Although Helman denied any sexual contact, the Family Court, after trial, credited the testimony of the victim and adjudicated Helman delinquent of one count of Unlawful Sexual Intercourse in the First Degree.

On January 11, 2000, the Family Court sentenced Helman to Immediate Aftercare. Additionally, pursuant to 11 Del.C. § 4121, the court ordered Helman to register as a sex offender and assigned him to

---

1. As required by Supr.Ct.Rule 7(d), we have assigned a pseudonym to the appellant whose appeal arose from a juvenile delinquency proceeding. We recognize, however, that the appellant will be required to register under his real name as a result of our ruling.

Risk Assessment Tier III. Thereafter, Helman requested, and was granted, a hearing at which he presented psychiatric and psychological reports supporting his assertion that he did not deserve to be designated a Tier III sex offender. Family Court ruled, however, that Helman's assignment to Risk Assessment Tier III was mandatory in the light of his conviction for Unlawful Sexual Intercourse in the first degree. At the hearing, the court noted that if it were afforded the discretion to do so, it may have assigned Helman to Risk Assessment Tier I, the lowest risk assessment level. Because of the constitutional implications of its ruling, the Family Court entered a Certificate of Reasonable Doubt staying execution of its order pending appeal. This appeal followed.

## II

■ This case presents an important issue of first impression: to what extent must a juvenile sex offender be afforded procedural due process protections before being designated to a statutorily-fixed Risk Assessment level. Helman's contention that Delaware's Sex Offender Registration Statute violates his constitutional rights under the State and Federal constitutions raises a question of law that this Court reviews *de novo*. *See Thomas v. State*, Del.Supr., 725 A.2d 424, 427 (1999).

■ All fifty states, the District of Columbia, and the federal government have adopted some form of statutory scheme commonly referred to as Megan's Law. *See* Wayne A. Logan, *Liberty Inter-*

ests in the Preventive State: Procedural Due Process and Sex Offender Community Notification Laws, 89 J.Crim.L. & Criminology 1167, 1171 (1999). The term "Megan's Law" encompasses two separate types of statutory requirements: sex offender registration and community notification. *See generally E.B. v. Verniero*, 3d Cir., 119 F.3d 1077, 1082–83 (1997), *cert. denied*, 522 U.S. 1109, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998) (describing sex offender registration and community notification components of New Jersey's Megan's Law scheme). Like many other states, Delaware's statutory scheme includes both registration and notification provisions. *See* 11 *Del.C.* §§ 4120 & 4121; *see also Coleman v. State*, Del.Supr., 729 A.2d 847, 849 (1999).

■ Generally, registration statutes require released sex offenders to register with law enforcement agencies in their community so that local authorities are aware that a convicted sex offender is present in the area. *See, e.g.*, Michael L. Skoglund, Note, *Private Threats, Public Stigma? Avoiding False Dichotomies in The Application of Megan's Law to the Juvenile Justice System*, 84 Minn.L.Rev. 1805, 1819 (2000). Notification statutes, on the other hand, provide for the dissemination to the community of information about the sex offender to make the public aware of his or her presence. *See id.* Delaware's statutory method of registration and notification is referred to as the "compulsory approach" and a similar scheme has been adopted by 19 states.[2]

**2.** *See* Ala.Code § 15–20–21 (1999); Alaska Stat. §§ 18.65.087, 12.63.010 et seq. (Michie 1999); Cal.Penal Code § 290 et seq. (West 1999); Conn.Gen.Stat. § 54–251 et seq. (1999); Del.Code Ann. tit. 11, § 4121(3) (1999); 730 Ill.Comp.Stat. 15⅖ et seq. (West 1999); Ind.Code § 5–2–12–4 et seq. (1999); Kan.Stat.Ann. § 29–4902 et seq. (1999); Mich.Comp.Laws Ann. § 28.722 et seq. (West 1999); Miss.Code Ann. § 45–33–1 et seq. (1999); Mo.Rev.Stat. § 589.400 et seq. (1999); N.H.Rev.Stat.Ann. § 651–B:1 et seq. (1999); N.M.Stat.Ann. § 29–11A–2 et seq. (Michie 1999); Okla.Stat. tit. 57, § 581 et seq. (1999); S.C.Code Ann. § 23–3–410 et seq. (Law.Co-op.1999); S.D.Codified Laws § 22–22–31 et seq. (Michie 1999); Tenn.Code Ann. § 40–39–102 et seq. (1997); Utah Code Ann.

Logan, *supra*, at 1175. This approach "requires that offenders satisfying statutory, offense-related criteria be subject to registration and notification, affording offenders no right to a prior hearing on the eligibility determination." *See id.*

In Delaware, after an individual is convicted of or adjudicated delinquent for any offense enumerated in the statute, the trial court must conduct a hearing at which the trial judge is required[3] to designate the defendant as a sex offender.[4] 11 *Del.C.* § 4121(c). The trial court is then required to assign an individual designated as a sex offender to one of three Risk Assessment Tier levels. *Id.* The sentencing court has no discretion in making this determination. Rather, the statute specifies what offenses will result in designation to each separate Tier level. 11 *Del.C.* § 4121(e). Of pertinence here, the statute provides, in part, that a sex offender shall be assigned to Risk Assessment Tier III as follows:

> (1) Risk Assessment Tier III. Any sex offender convicted or adjudicated delinquent of any of the following offenses shall be designated by the court to Risk Assessment Tier III:

> > a. Rape in the First Degree, Rape in the Second Degree, Unlawful Sexual Contact in the First Degree, Unlawful Sexual Intercourse in the First or Second Degree, Unlawful Sexual Penetration in the First or Second Degree, Unlawful Sexual Contact in the First Degree, Continuous Sexual Abuse of a Child, Sexual Exploitation of a Child. . . .

11 *Del.C.* § 4121(e)(1)(a). The statute clearly delineates the tier to which a sex offender is to be assigned based on the particular offense for which that individual was convicted and mandates assignment to that Tier level without any regard to the facts or circumstances of the particular case. *Id.* In essence, the statute is offense driven without regard to mitigating factors of the offender or the offense.

The community notification provisions are triggered when the statute requires assignment of a convicted offender to Risk Assessment Tier II or III. 11 *Del.C.* §§ 4121(j)(2), 4121(a)(1), & 4121(a)(3). Designation as a Tier III sex offender results in the broadest community notification possible. For those offenders who are designated to Risk Assess-

---

§ 77–27–21.5 et seq. (1999); Va.Code Ann. § 19.2–298.1 (Michie 1999).

**3.** There is one exception to the mandatory registration requirement that allows sex offenders convicted of misdemeanors to petition the sentencing court for relief from registration. 11 *Del.C.* § 4121(e)(6) provides:

> Notwithstanding any provision in this section or in § 4120 . . ., any person who would otherwise be designated as a sex offender . . . may petition the sentencing court for relief from such designation, and from all obligations imposed by this section and § 4120 of this Title if:
> a. the offense for which the person was convicted was a misdemeanor; and
> b. the person has not previously been convicted of a violent felony, or any other offense set forth in paragraph (a)(4) of this section . . .; and

> > c. the sentencing court determines by a preponderance of the evidence that such a person is not likely to pose a threat to public safety if released from the obligations imposed by this section, and by § 4120 of this Title. . . .

**4.** 11 *Del.C.* § 4121 defines sex offender to include any person who is, or has been:

> a. Convicted after June 27, 1994, of any of the offenses specified in §§ 765 through 780, § 1100, §§ 1108 through 1112A, § 1352(2) or § 1353(2) of this title, or of any attempt to commit any of the aforementioned offenses; or
> b. Any juvenile who is adjudicated delinquent after June 27, 1994, of any offense which would constitute any of the offenses set forth in subparagraph a. of this paragraph if he or she had been charged as an adult. . . .

ment Tier III, "notification *shall* consist of searchable records available to the public as well as community notification."[5] 11 *Del.C.* § 4121(j)(2) (emphasis supplied). In general, the statute provides that community notification entails:

[N]otice which is provided by any method devised specifically to notify members of the public who are likely to encounter a sex offender. Methods of notification may include door-to-door appearances, mail, telephone, newspapers or notices to schools and licensed day care facilities within the community, or any combination thereof. Community notification may also include a photograph of the offender.

11 *Del.C.* § 4121(a)(1). Searchable records available to the public are defined as:

[R]ecords regarding every sex offender convicted after June 27, 1994, who is subject to the registration requirements of § 4120 of this title and who is thereafter designated to Risk Assessment Tier II or III pursuant to this section. Such records shall also include the last verified address for the offender, and shall identify the specific sex offense(s) for which the offender was convicted, and the date(s) of the conviction(s). The records may also include other information designated for public access by the Superintendent of the Delaware State Police. These records shall be searcha-

ble by the name of the sex offender and by suitable geographic criteria, and shall be made available to the public upon request through police agencies and public libraries, and by means of the Internet. . . .[6]

11 *Del.C.* § 4121(a)(3). The chief law enforcement officer of the local jurisdiction where the sex offender intends to reside, or the Superintendent of the State Police where there is no local law enforcement, is required to provide public notification in the local community as mandated by the statute. 11 *Del.C.* § 4121(j).

A sex offender designated to Risk Assessment Tier III is required to comply with the registration provisions of § 4120 for the remainder of his or her life and will therefore always be subject to the community notification requirements of the statute. 11 *Del.C.* § 4121(f)(1). In addition, an offender designated to Tier III must reregister "[e]very 90 days following the date of completion of the initial registration form" while an individual designated as a Tier I or II offender must do so every year. 11 *Del.C.* § 4120(g)(1)(a) & (b). An offender who knowingly or recklessly fails to comply with the registration and reregistration requirements is guilty of a class G felony, which carries a potential penalty of up to 2 years in prison. 11 *Del.C.* § 4120(k). The only relief afforded a Level III sex offender is the opportunity

---

**5.** For those offenders assigned to Risk Assessment Tier II, notification requires inclusion of the sex offender in the searchable records database and may also include community notification pursuant to 11 *Del.C.* § 4121(m)(3)

**6.** The Delaware State Bureau of Identification has developed an Internet accessible database that contains a listing of all the Tier II and III sex offenders who registered pursuant to the statute. *See Delaware State Police State Bureau of Identification Sex Offender Central Registry* (last modified Jan. 24, 2001) <http://www.state.de.us/dsp/sexoff/in-

dex.htm>. On the web site, Tier III offenders are designated as having a "high risk assessment." *Id.* Offenders who are in the Tier II category are designated as having a "medium risk assessment." *Id.* The site does not indicate what a high or medium risk assessment means. Rather, it recites the statutory provision regarding the predicate offenses that an individual must have been convicted of in order to be designated as a Tier II or III offender. *See id.* § 4121(e)(1)(2). Visitors to the site are warned before gaining entry that the use of the information contained therein to commit a criminal act against any person will result in criminal prosecution.

to petition for a reduction to Level II after the passage of 15 years from the date of sentencing. 11 *Del.C.* § 4121(f)(2).

## III

 We begin our analysis of the effect of the Sex Offender Registration Statute by acknowledging the presumption of constitutionality that acts of the General Assembly necessarily enjoy. *New Castle County Council v. State*, Del.Supr., 688 A.2d 888, 891 (1996). This presumption not only imposes upon one attacking the constitutionality of a statute the burden of demonstrating its invalidity, but also requires a measure of self-restraint upon courts sitting in review over claims of unconstitutionality. *Wilmington Medical Center, Inc. v. Bradford*, Del.Supr., 382 A.2d 1338, 1342 (1978). That restraint requires deference to legislative judgment in matters "fairly debatable." *Id.* Courts are not super-legislatures and it is not a proper judicial function to decide what is or is not wise legislative policy. *See Konstantopoulos v. Westvaco Corp.*, Del.Supr., 690 A.2d 936, 940 (1996) ("It is not our role to assume the prerogative of the General Assembly."). Moreover, the General Assembly's articulation of public policy, while not conclusive, is entitled to great weight when assessing the need for legislative change. *Opinion of the Justices*, Del.Supr., 358 A.2d 705 (1976).

 In examining whether an individual is entitled to procedural due process protection, it must first be determined whether a liberty or property interest is at stake.[7] *See Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citations omitted); *Matter of Tavel*, Del.Supr., 661 A.2d 1061 (1995). A protected liberty interest may be found under either the Fed-

eral Constitution or the Constitution or laws of the state. *See Sandin v. Conner*, 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). If there is a liberty interest being interfered with by State action, the analysis shifts to a determination of whether the procedures afforded the individual whose interest is infringed are constitutionally sufficient. *See Kentucky Dep't of Corrections*, 490 U.S. at 460, 109 S.Ct. 1904; *E.B. v. Verniero*, 119 F.3d at 1106. In *Verniero*, the Third Circuit engrafted federal procedural due process requirements upon New Jersey's Megan's law after first recognizing the existence of a state-created liberty interest. Similarly, the recognition by this Court of a liberty interest created by the Delaware Constitution would require us to engraft upon the statute certain procedural mechanisms to ensure that an individual is not deprived of such a liberty interest without due process of law. Included among those procedural protections is the opportunity to contest any presumptive designation.

Helman contends that Delaware's tier designation scheme denies him due process of law under the Fourteenth Amendment to the United States Constitution and Article I, § 7 of the Delaware Constitution. He asserts that there is a recognized liberty interest created under the United States Constitution that flows from his right to privacy and his right to protect his reputation. Helman further argues that the Delaware Constitution specifically protects an individual's interest in his or her reputation. On this basis, Helman contends that the tier designation portion of the statute is constitutionally deficient because there are "[n]o procedures ... available for a convicted individual to challenge the assessment or to offer expert

---

7. Helman does not contend that a protected property interest is infringed upon by his classification as a Tier III sex offender. There-

fore, the analysis will focus on whether there is a protected liberty interest.

testimony or other evidence in rebuttal." The State responds that Helman has failed to show that his alleged privacy and reputational injuries are protected liberty interests under the federal or state constitution and is thus not entitled to any more procedural protections than those that were provided at the Family Court proceedings.

█ The State argues that no further process is necessary to ensure that Helman was not erroneously designated to the wrong tier level because it was the legislature, not a judge, prosecutor, or review board, that determined Helman's tier designation by mandating offense-related criteria. The State characterizes Helman's argument as directed to the substance of the statute thus raising an issue of substantive, not procedural, due process.

As noted, under Delaware's Sex Offender Registration Statute, there is no discretion in tier level assignment. Unlike other states' statutory schemes, there is no independent decision-making under the Delaware statute to determine to which Risk Assessment level a convicted offender will be assigned. The discretionary risk assessments used in classifying sex offenders for notification purposes in states such as New Jersey involve factual determinations necessarily implicating concerns of procedural due process. Those factual determinations are absent in Delaware's statutory scheme.

In the Delaware scheme, all sex offenders are designated at least to Risk Assessment Tier I. For those offenders who commit crimes that the legislature has deemed more serious, thereby warranting broader community notification, a sex offender will be assigned to Risk Assessment Level Tier II or III. There is, however, no discretion to be exercised by the trial court or other State personnel at the administrative level. The legislature has determined the predicate crimes for classification as a Tier II or III sex offender. Because the only determination to be made is whether the offender committed an offense requiring classification as a Tier II or III offender, further procedures would serve no purpose. *See People v. Logan,* 235 Ill.Dec. 539, 705 N.E.2d at 161. Helman's attack on the statutory scheme's lack of procedural protections is really a substantive challenge to the statute itself.[8]

In *Lanni v. Engler,* E.D.Mich., 994 F.Supp. 849, 855 (1998), the Court held that because the sex offender act at issue required all offenders to register and subjected all offenders to limited public disclosure, "a hearing would serve no purpose." *Lanni,* 994 F.Supp. at 855; *see also People v. Logan,* 302 Ill.App.3d 319, 235 Ill.Dec. 539, 705 N.E.2d 152, 161 (1998) (holding that a hearing would serve no purpose "because the Registration Act and Notification Law subject all sex offenders as defined by the Registration Act to the registration and notification provisions, [and] law enforcement authorities have no discretion to determine which offenders would be exposed to public dissemination").[9] Indeed, as the Supreme Court has stated: "Where a rule of conduct applies

---

8. Helman has not leveled a substantive due process attack on the statute and this analysis does not address the propriety of such a claim. We recognize, however, the difficulty in succeeding on such a claim under the applicable "rational basis" test.

9. For a criticism of the decisions in these cases see Logan, *supra* at 1210–11 (stating

that "Contrary to the teleological reasoning of the Eastern District of Michigan and Illinois Court of Appeals in opinions discussed above, the fact that a particular jurisdiction's registration and notification scheme does not differentiate among offenders, and thus relies exclusively upon blanket legislative assessment of community danger, should not alter the liberty interest analysis").

to more than a few people, it is impracticable that everyone should have a direct voice in its adoption." *Bi–Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 60 L.Ed. 372 (1915). The Court further noted that:

> General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.

*Bi–Metallic Inv. Co.*, 239 U.S. at 445, 36 S.Ct. 141.

### A.

■■■ Seeking to build his procedural due process claim on a protected liberty interest, Helman argues that the Delaware Constitution requires that the State accord him due process rights before he may be designated to a Risk Assessment level, because Article I, § 7 of the Delaware Constitution provides that an individual shall not be "deprived of life, liberty, or property, unless by the judgment of his peers or by the law of the land." Del. Const. art. I, § 7. In similar fashion, the Fourteenth Amendment of the United States Constitution provides that "no person shall be deprived of life, liberty, or property without due process of law." U.S. Const. amend. XIV. This Court has previously determined that the due process clause of the Delaware Constitution has "substantially the same meaning" as the due process clause contained in its federal counterpart. *Opinion of the Justices*, Del.Supr., 246 A.2d 90, 92 (1968). *But see Deberry v. State*, Del.Supr., 457 A.2d 744 (1983); *Bryan v. State*, Del.Supr., 571 A.2d 170 (1990). He asserts that registration at Tier III will expose him to unnecessary public scrutiny, and perhaps harassment, harmful to his reputation.

■■■ Helman points to the preamble to Delaware's Constitution, which provides that: "[t]hrough divine goodness, all men have by nature the rights ... of acquiring and protecting reputation ... and as these rights are essential to their welfare, for due exercise thereof, power is inherent in them...." Del. Const. preamble. Moreover, Helman argues that Article I, § 9 of the Delaware Constitution provides a basis for finding a liberty interest in reputation under the Delaware constitution. Article I, § 9 provides, in part, that:

> All courts shall be open; and every man for an injury done him in his reputation, person, movable or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense.[10]

Del. Const. art. I, § 9.

■■■ This Court has recognized, in the context of a defamation suit, the protection afforded to an individual's reputation by the Delaware Constitution. *See Kanaga v. Gannett Co., Inc.*, Del.Supr., 687 A.2d 173 (1996). In *Kanaga*, we considered the scope of Article I, § 9 in balancing the

---

10. Article I, § 9 is part of the Delaware Constitution's Bill of Rights and is referred to as the "open courts" or "remedies" clause. *See Ramunno v. Cawley*, 705 A.2d 1029, 1035 (1998). The constitutions of 1792 and 1831 contained a provision identical to that embodied in Article I, § 9 of the current Constitution, adopted in 1897. The Delaware Bill of Rights is a source of important rights not protected by the Fourteenth Amendment, such as the right to a jury trial in civil cases, *see McCool v. Gehret*, Del.Supr., 657 A.2d 269, 282 (1995), *Opinions of The Justices*, Del.Supr., 88 A.2d 128, 131 (1952), and indictment by a grand jury.

right of speech and a citizen's ability to seek civil redress for publication of defamatory information. This Court commented that: "Section 9, in our view, establishes a strong state constitutional basis for remedies to recompense damage to one's reputation...." *Id.* at 177.

The invocation of Article I, § 9 in *Kanaga,* however, arose in circumstances different from those posed by this appeal. In *Kanaga,* we cited Article I, § 9 in the context of a citizen's ability to seek civil redress for damage to reputation resulting from defamatory statements published in a newspaper article. The analysis in *Kanaga* does not apply to the disclosure resulting from criminal prosecutions which, by their nature, are public proceedings. Essentially, *Kanaga* recognized a Delaware citizen's constitutionally grounded ability to seek redress for defamation which causes injury to his or her reputation. But Helman's designation as a sex offender, while potentially damaging to his reputation, is not defamatory. The information that the State would disseminate is truthful, public information identifying Helman by name, address, and crime.

■ Article I, § 9 of the Delaware Constitution is referred to as the "open courts clause." *See Kanaga,* 687 A.2d at 178 n. 9. A similar version of this provision is contained in the constitutions of 37 states. *See id.* As demonstrated in our holding in *Kanaga,* open courts clauses have been interpreted to secure the accessibility of the courts and to prevent judicial abuse. *See, e.g., Meech v. Hillhaven West, Inc.,* Mont.Supr., 238 Mont. 21, 776 P.2d 488 (1989); *see also,* Jonathan M. Hoffman, *By the Court of the Law: The Origins of the Open Courts Clause of State Constitutions,* 74 Or.L.Rev. 1279 (1995) (discussing the different interpretations and analyses applied by various courts to the open courts clause). Article I, § 9, and our interpretation of that provision thus far, secures a Delaware citizen's right to seek redress in the Courts of this State for an injury done to him or her, including defamation. It does not, however, provide a basis for finding a broad liberty interest protectable from State-directed disclosure of information arising from criminal prosecutions.

### B.

■ We next consider whether a federally protected liberty interest is implicated where the government disseminates information about a convicted sex offender that has the effect of tarnishing that individual's reputation. Although Helman asserts that community notification violates a protected interest in his reputation under the Federal Constitution, we conclude that a federally protected liberty interest is not implicated under these circumstances and therefore no additional process is due.

■ "[R]eputation alone, apart from some more tangible interest such as employment, is [not] 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The plaintiff in *Paul* argued unsuccessfully that he was entitled to due process before law enforcement officials were permitted to distribute to local businesses a flyer that contained his name and photograph on a list of "active shoplifters." In rejecting this claim the Supreme Court ruled that the damage to one's reputation resulting from disclosure of negative information does not by itself give rise to a constitutional claim. *See also Siegert v. Gilley,* 500 U.S. 226, 233–34, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Rather, the government conduct that has the effect of stigmatizing an individual must be accompanied by the alteration of a "right or status previously recognized by state law" to trigger due process

rights. *Paul,* 424 U.S. at 712, 96 S.Ct. 1155. This has come to be known as the "stigma plus test." *See Sturm v. Clark,* 3d Cir., 835 F.2d 1009, 1012 (1987).

More to the point, recent Federal decisional law does not support the assertion that mere injury to a sex offender's reputation is sufficient to implicate a legitimate liberty interest under other state statutory schemes. *See Cutshall v. Sundquist,* 6th Cir., 193 F.3d 466, 479 (1999), *cert. denied,* 529 U.S. 1053, 120 S.Ct. 1554, 146 L.Ed.2d 460 (2000); *Russell v. Gregoire,* 9th Cir., 124 F.3d 1079, 1094 (1997), *cert. denied,* 523 U.S. 1007, 118 S.Ct. 1191, 140 L.Ed.2d 321 (1998); *E.B. v. Verniero,* 3d Cir., 119 F.3d 1077, 1102–04 (1997), *cert. denied,* 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998).

We conclude that a federal liberty interest is not implicated under the facts of this case. Helman has not alleged that the community notification consequences of his designation as a Tier III offender will result in the alteration of a legal right. Helman broadly asserts that: "Under the Delaware legislative scheme, a mistake made by a youth at age 14 will automatically brand him for the rest of his life as a sexual predator and subject him to loss of employment opportunities, a lessened ability to form relationships and a wide range of community reprobation both foreseen and unforeseen." Something more than broad allegations of the potential for future harm is required. We recognize that the dissemination of this information to certain employers in the community may make it more difficult for Helman to obtain employment and establish familial and social relationships, but the dissemination of this information does not completely foreclose him from obtaining employment or establishing relationships. There is no evidence that community notification will re-

sult in the alteration of a tangible interest held by Helman and we thus conclude that Helman has failed to satisfy his burden under the stigma plus test.[11]

### C.

▇▇▇▇ Helman next argues, in cursory fashion, that he has a privacy interest with respect to the information contained in the public notification. The right to privacy under the United States Constitution has been interpreted to apply to personal decisions involving marriage, procreation, contraception, family relationships, and child rearing and education. *Carey v. Population Services, Intern.,* 431 U.S. 678, 684–85, 97 S.Ct. 2010, 52 L.Ed.2d 675; *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 848, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The information Helman contends should not be disclosed under the Notification Statute is not within any of these recognized privacy areas.

▇▇▇▇ An individual does not have a constitutional right to keep private information that is already available to the public. *See Russell v. Gregoire,* 9th Cir., 124 F.3d 1079, 1094 (1997). Helman's privacy concern is heightened by the fact that he was a juvenile when adjudicated delinquent in Family Court. Records of delinquency adjudications and other Family Court matters involving juveniles are kept confidential as required by court rules and statute. "[P]roceedings in a crime classified as a felony, [however], shall be open to the public." 10 *Del.C.* § 1063(a). Furthermore, there is no constitutional right to keep such information confidential. Moreover, because the legislature specifically included juvenile adjudications of delinquency within the community notification provisions, the General

---

11. Our analysis under the "stigma plus test" is limited to the community notification provisions and need not extend to the registration requirements under the statute.

Assembly apparently intended all offenders to be covered by the reach of the statute.[12]

Cases addressing whether community notification provisions implicate a liberty interest in privacy under the 14th Amendment to the United States Constitution have come to varying conclusions. *See Russell v. Gregoire*, 9th Cir., 124 F.3d 1079, 1093–94 (1997) (suggesting that the federal right to privacy is narrow, holding that the type of information disseminated under Washington's notification scheme authorizing disclosure of the general vicinity of the offender's residence "is already fully available to the public and is not constitutionally protected."); *Cutshall*, 193 F.3d at 480 (same); *State v. Williams*, 88 Ohio St.3d 513, 728 N.E.2d 342, 356 (2000) ("The information disseminated to the public ... is a public record, and the right to privacy encompasses only personal information and not information readily available to the public.").

 Section 4121(a)(3) provides for the disclosure of a sex offender's address, the offense for which he or she was convicted, and the date of the conviction. The statute further provides that this information is to be contained in searchable records available to the public. In addition, "[c]ommunity notification may also include a photograph of the offender." We note initially that most of this information is public in nature, particularly the offense an individual has been convicted of and the date of that offense. Some courts have expressed concern over the dissemination

of an offender's home address, since such information is not required to be public. *See Paul P. v. Verniero*, 3d Cir., 170 F.3d 396, 404 (1999) (noting "the general understanding that home addresses are entitled to some privacy protection");[13] *Poritz*, 662 A.2d at 409 (holding that disclosure of home addresses implicates privacy interests because, although addresses are publicly available, inclusion of addresses in the notification may expose offenders to harassment). Delaware's statute also provides for dissemination of home addresses and other information. *See* 11 *Del.C.* § 4121(a)(3).

 In *Paul P. v. Verniero*, the Third Circuit acknowledged privacy concerns with respect to home addresses, but found the government interest in disclosure compelling, and therefore found no need to comment on the "dissemination" approach of *Poritz*. The dissemination of the information pursuant to the notification statute is narrowly tailored to serve a compelling interest, protecting members of a community from violent and dangerous sex offenders. The statute is narrowly tailored because it restricts dissemination of the offenders name, address, offense, and date of conviction to members of the community who are likely to encounter a sex offender. Moreover, all this information is contained on the Delaware State Police website to allow members of the public to find out whether *any* members of their community pose a threat and visitors to the site are warned that use of that information against an offender will result in criminal

---

12. As this Court has stated, "[t]here is no basis to conclude that juveniles should be exempt from the operation of the statute simply because the criminal process for juveniles is essentially confidential as required by statute. Indeed, the statutory mandate of sexual registration would become meaningless without disclosure of the defendant's identity." *Murphy v. State*, Del.Supr., 755 A.2d 389, 2000 WL 724711 (May 24, 2000) (ORDER),

citing *Coleman v. State*, Del.Supr., 729 A.2d 847 (1999). *See also* 10 *Del.C.* § 1063(a).

13. *Paul P.*, another challenge to Megan's Law in the third circuit, dealt with the right to privacy. The *Paul P.* court noted that although *E.B.* contained some discussion of the privacy issue, that issue had not been squarely presented to the *E.B.* court.

prosecution. Therefore, we do not find that the disclosure of an offender's address pursuant to the community notification scheme violates any privacy interest.

## IV

Helman further contends that the mandatory designation as a Tier III sex offender upon conviction of specified offenses violates due process by establishing a constitutionally excessive presumption. Helman contends that 11 *Del.C.* § 4121(e) establishes a mandatory and conclusive presumption that all individuals convicted of unlawful sexual intercourse in the first degree, irrespective of their age or personal characteristics, must be designated a Tier III sex offender. Essentially, Helman contends that it is not logical to presume that a juvenile convicted of unlawful sexual intercourse in the first degree should be subject to the debilitating effects of Tier III designation for the remainder of his or her life.

■■■■ A mandatory presumption exists where a statute provides that "proof of a basic fact renders the existence of the presumed fact conclusive...." Blacks Law Dictionary 1204 (7th ed.1999). Where a mandatory presumption is implicated, the trier of fact is required to presume the existence of one fact from the proof of another. *See Government of Virgin Islands v. Parrilla,* 3d Cir., 7 F.3d 1097, 1102 (1993) ("With mandatory presumptions, ... we are faced with a statutory command that, because one fact is proved, another fact must follow."). The use of a mandatory presumption of course raises significant concerns because it relieves the State from having to establish certain facts with independent evidence. *Id.* at 1102. A mandatory presumption is proper only if there is a "rational connection" between the proven fact and the presumed fact. *Id., citing Leary v. U.S.,* 395 U.S. 6, 36, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969).

■■■■ Helman asserts that the proven fact here was that he was adjudged delinquent of unlawful sexual intercourse in the first degree, and the statute conclusively presumes from that fact that he must be assigned to Tier III. There is, however, no fact to be presumed from Helman's conviction. The statute provides that an individual will be assigned to Tier III if he or she is convicted of an enumerated offense in that category. There is no fact finding process to which a presumption could apply. Classification as a Tier III sex offender is a legal consequence of being adjudged delinquent of Unlawful Sexual Intercourse in the first degree. Helman's presumption argument is simply an attack on the statute's classification scheme. The presumption Helman complains of is no more than a legislative classification of persons according to the crimes they commit.

■■■■ In essence, Helman's "presumption" argument constitutes an equal protection claim. The equal protection clause does not prohibit the classification of individuals. Rather, it prohibits the arbitrary classification of persons to whom the statute is directed. *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 466, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). Under the Fourteenth amendment, where a fundamental right or a suspect class is not implicated, a classification will be upheld if it is demonstrated that it is rationally related to a legitimate government interest. *See Kimel v. Florida Board of Regents,* 528 U.S. 62, 84–85, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *Turnbull v. Fink,* Del. Supr., 668 A.2d 1370, 1379 (1995). Helman has the burden of showing a lack of rational justification for the classification created

by the statute. *See id; Turnbull,* 668 A.2d at 1378. Moreover, the burden appears to be a heavy one. *Id.* ("Usually, governmental action enjoys a strong presumption of constitutionality and statutory classifications will be set aside only if no grounds can be conceived to justify them.") (citations omitted).

■■■■■ The purpose of the sex offender registration and notification statutes is to protect the public from the danger and propensity for recidivism of convicted sex offenders. Section 4121(e)(1) enumerates the crimes that trigger Tier III designation.[14] Tier III crimes are more dangerous, by definition, than their Tier II counterparts.[15] The General Assembly could have rationally concluded that more dangerous offenders present a greater risk to the community, justifying heightened notification vis-à-vis those who commit acts of lesser gravity. *See Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 414 (1995) ("It is well-settled that classifying offenders according to the offense committed is subject to rational basis analysis."). Studies indicate that sex offenders, particularly those who target children, are likely to offend again. *See, e.g.,* Robert Teir & Kevin Coy, *Symposium: The Treatment of Sex Offenders; Approaches to Sexual Predators: Community Notification and Civil Commitment,* 23 New Eng.J. on Crim. & Civ. Confinement 405, 407 (1997) (discussing a Justice Department survey that "found that sexual predators who victimized children were more than twice as likely to have multiple victims as a sex offender who targets adults"). The means of accomplishing the goal of protecting the public that were adopted by the legislature in enacting the sexual registration statute are clearly rational. Therefore, we conclude that the statute does not violate the Equal Protection Clause.

## V

■■■ Helman's final contention is that the public notification scheme violates the *Ex Post Facto* clause of the United States Constitution. Helman asserts that the notification provisions constitute punishment because the statute goes beyond what is necessary to achieve its purpose—protecting the public from dangerous sex offenders who are likely to strike again—and is therefore not a measured response to the statute's purpose. Helman further contends that the effects of the notification provisions are so harsh that the statute must be considered punitive in nature. The State responds that the notification scheme does not constitute punishment, but rather is a "measured legislative response to the recognized need of the public to be informed of the presence of sex offenders in their community in order that they may take appropriate precautions to protect themselves against the risk of recidivism."

■■■■■ Article I, § 9 of the United States Constitution, commonly known as the *Ex Post Facto* Clause, provides that "No ... ex post facto Law shall be passed." U.S. Const. art. I, § 9. The Clause prohibits, *inter alia,* the retroactive application[16] of a law that "changes the

---

**14.** The crimes triggering Tier III designation include: Rape in the First Degree, Rape in the Second Degree, Unlawful Sexual Contact in the First Degree, Unlawful Sexual Intercourse in the First or Second Degree, Unlawful Sexual Penetration in the First Degree or Second Degree, Unlawful Sexual Contact in the First Degree, Continuous Sexual Abuse of a Child, and Sexual Exploitation of a Child. *See* § 4121(e)(1)a.

**15.** *Compare, e.g.,* 11 *Del.C.* §§ 774, 775 (Unlawful Intercourse in the First and Second degree; both Tier III crimes) *with* 11 *Del.C.* § 773 (Unlawful Intercourse in the Third Degree; a Tier II crime).

**16.** The community notification provisions of § 4121 became effective on March 1, 1999 and apply to individuals convicted after February 28, 1999. Helman was adjudicated de-

punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull,* 3 U.S. 386, 390, 3 Dall. 386, 1 L.Ed. 648 (1798); *DiStefano v. Watson,* Del.Supr., 566 A.2d 1, 5 (1989). An *Ex Post Facto* law is one that "imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (citations omitted). The Clause is implicated only where a statute is criminal or penal, *i.e.,* where the statute imposes punishment. *E.B. v. Verniero,* 119 F.3d at 1092. Laws that are deemed civil or remedial in nature present no Ex Post Facto concern. *See Femedeer v. Haun,* 10th Cir., 227 F.3d 1244, 1248 (2000). The dispositive issue, therefore, is whether the notification called for by the statute constitutes punishment. *See E.B. v. Verniero,* 119 F.3d at 1092.[17] Whether a statute is civil or criminal in nature is a question of statutory interpretation. *See Allen v. Illinois,* 478 U.S. 364, 368, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986).

The courts that have addressed this issue have held, almost uniformly, that sex offender registration statutes are not punitive and therefore retroactive application of the statutes do not violate the *Ex Post Facto* provision of the Constitution. See, e.g., *Roe v. Office of Adult Probation,* 2d Cir., 125 F.3d 47, 55 (1997); *Russell v. Gregoire,* 9th Cir., 124 F.3d 1079, 1094 (1997); *E.B. v. Verniero,* 3d Cir., 119 F.3d 1077, 1111 (1997), *cert. denied,* 118 S.Ct.

1039, 522 S.Ct. 1109, 1110, 140 L.Ed.2d 105 (1998); *Cutshall v. Sundquist,* 6th Cir., 193 F.3d 466, 477 (1999); *Femedeer v. Haun,* 10th Cir., 227 F.3d 1244, 1253 (2000).

In *E.B. v. Verniero,* the Third Circuit found that New Jersey's notification scheme was "reasonably related to the nonpunitive goals of Megan's law." 119 F.3d at 1098. Its conclusion in this regard flowed from its finding that notification was "carefully tailored" and that the risk assessment guidelines were a "measured response." *Id.* Helman argues that Delaware's scheme, in contrast to New Jersey's, "goes far beyond what is necessary to achieve" the purpose of protecting the public, because Delaware provides for notification even without evidence that an individual is dangerous. Similarly, Helman points out that *Poritz* limited New Jersey's Tier III notification to those "likely to encounter the victim" by striking down the Attorney General guidelines that allowed for "community meetings, speeches in schools and religious congregations." *Poritz,* 662 A.2d at 385. Delaware, in contrast, allows Internet publication as part of the "searchable records available to the public" and provides for broad "community notification" "by any method devised specifically to notify members of the public who are likely to encounter a sex offender." 11 *Del.C.* § 4121(a)(1).

■■■■ The case of *Hudson v. U.S.,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), appears to supply an instructive *Ex Post Facto* analysis.[18] The *Hudson* case

---

linquent on August 16, 1999 and sentenced on January 11, 2000. The offense in this case, however, occurred in 1994 or 1995, prior to the effective date of the statute.

**17.** In *Coleman v. State,* Del.Supr., 729 A.2d 847, 850–51 (1999), we referred to 11 *Del.C.* § 4120(a) as a "penal statute" but only in the sense that the statute must be construed according to the fair import of its terms "to

effect the purposes of the law" (quoting 11 *Del.C.* § 203). In *Coleman,* we viewed the statute as penal only because of the statutory mandate that the sex offender registration be imposed at the time of sentencing.

**18.** *Hudson* involved a double jeopardy claim, but the question whether there is punishment is the same under each clause, and the same analysis applies. *See E.B.,* 119 F.3d at 1092.

post-dates *E.B. v. Verniero* and several other of the cases discussed by the parties. Pursuant to *Hudson,* deciding whether a statute imposes punishment involves a two-step inquiry pursuant to what is known as the "intent-effects test." *Id.* at 99, 118 S.Ct. 488. A court must first determine whether the legislature has expressly or impliedly indicated a preference that the statute be considered punitive or remedial. *See id.* If the court concludes that the legislature intended the statute to serve punitive ends, then the statute will be considered punitive in nature and may not be retroactively applied. *See id.* If, however, the court finds the legislature has expressed a preference for considering the statute civil, or where the intent of the legislature is unclear, a court must then determine whether the statute is "so punitive either in purpose or effect" that it should be considered to constitute punishment. *Id.* at 99, 118 S.Ct. 488 (quoting *U.S. v. Ward,* 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). This inquiry into the punitive effect of the statute is to be guided by the factors outlined by the Supreme Court in *Kennedy v. Mendoza–Martinez,* which examine:

1) whether the sanction involves an affirmative disability or restraint;
2) whether it has historically been regarded as a punishment;
3) whether it comes into play only on a finding of scienter;
4) whether its operation will promote the traditional aims of punishment—retribution and deterrence;
5) whether the behavior to which it applies is already a crime;
6) whether an alternative purpose to which it may rationally be connected is assignable to it; and
7) whether it appears excessive in relation to the alternative purpose assigned.

*Id.* at 99–100, 118 S.Ct. 488 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). "The clearest proof" is required to show that the effects are so punitive as to trump legislative intent. *Id.* at 104, 118 S.Ct. 488.

■■■ Because the General Assembly chose not to include a statement of purpose in the statute upon its adoption, we must examine whether the statute is so punitive in either purpose or effect as to constitute punishment. Helman seems to concede that the purpose of the statute is protection rather than punishment, stating that: "The understandable purpose of the notification scheme is to protect the public...." Indeed, the remedial intent of the statute can nonetheless be divined from the statute itself. Specifically, "community notification" is limited to those "likely to encounter a sex offender." 11 *Del.C.* § 4121. This is a strong indication that the intent of the statute is to protect the community, not to punish the offender. *See Femedeer,* 227 F.3d at 1249 (inferring legislative intent from statutory language).[19] Since the overarching legislative purpose is protection of the public, it does not appear that the legislature intended the statute to serve punitive purposes.

A review of the factors outlined by the Supreme Court in *Kennedy* lends further

**19.** We do not believe that simply because the statute was included in the criminal code it necessarily evidences a legislative intent to make the statute penal. *Compare Cutshall v. Sundquist,* 193 F.3d at 474 (1999) (stating that "location within criminal procedure laws does not necessarily indicate an intent on the part of the legislature to punish") *with Kansas*

*v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (interpreting the placement of a commitment statute for sexual predators in the state's civil code, rather than in its criminal code, as an indication of an intent on the part of the legislature not to punish).

support to the conclusion that the statute is not punitive. The public notification scheme does not involve an affirmative disability or restraint. There is neither a requirement that the offender do anything to effectuate community notification nor refrain from doing something. Historically, it would appear that such statutes have not been regarded as punishment. Sexual registration/notification statutes are relatively new, but in their brief history most courts seem to regard notification statutes as remedial in nature. *See, e.g., E.B. v. Verniero*, 119 F.3d at 1101–05. The statute takes effect upon the designation of an individual as a Tier III sex offender. The only predicate requirement is that an offender be convicted or adjudged delinquent of an offense requiring Tier III notification. Therefore, a finding of *scienter* is not required to bring the notification provisions into play. The statute does not operate to promote retribution or deterrence; rather, the statute is designed to prospectively safeguard members of the community by informing them that a convicted sex offender is living among them.

Finally, the statute's purpose is clear: to protect members of the community from likely recidivists. No other purpose can be rationally connected to it. Thus, under the factors outlined in *Kennedy v. Mendoza–Martinez*, the notification provision does not constitute punishment. The community notification scheme is a measured response to the goal of protecting the public by allowing law enforcement and those members of the community likely to encounter the sex offender to be cognizant of the potential danger. Only those individuals who commit the more serious crimes are subject to the notification requirements. Tier I offenders are not subject to the notification provisions. *See* 11 *Del.C.* § 4121(a)(3) & (j), and community notification is not mandatory for Tier II offenders. *See* 11 *Del.C.* § 4121(j)(1). These distinctions illustrate the measured response of the statute to the need for community protection. Since we conclude that the community notification provisions are not punitive, we find no basis for invalidating the statute on *ex post facto* grounds.

VI

After hearing oral argument in this matter, we requested supplemental briefing in light of a recent decision of the New Jersey Supreme Court which considered the sexual registration of juvenile offenders. *In the Matter of J.G.*, 169 N.J. 304, 777 A.2d 891 (2001). After an analysis of the interplay between juvenile delinquency adjudication and New Jersey's Megan Law, the Court ruled that with respect to juveniles adjudicated delinquent for sexual offenses committed when they were under age 14, statutory sex offender registration and community notification orders would terminate at age 18 if the trial court, after a hearing held on motion of the juvenile, determines on the basis of clear and convincing evidence that the delinquent is not likely to pose a threat to the safety of others. *Id.* at 912. Eligible juveniles unable to satisfy that high standard of proof would continue to be subject to the registration and notification provisions of the statute. *Id.*

The New Jersey Supreme Court decision reconciled the confidentiality mandate of that State's Juvenile Code with the disclosure policies underlying Megan's Law by gauging legislative intent from the sequence of the competing statutes. The Court was mindful of the fact that approximately one year after the effective date of Megan's Law, the New Jersey Juvenile Code's statement of purpose was amended to remove certain statutory consequences of juvenile criminal behavior, and to substitute therefor a program of supervision, care and rehabilitation. *Matter of J.G.*, 777 A.2d at 901. The Court viewed the later in time provision according confiden-

tiality to juvenile delinquency adjudications as taking precedence over the registration and notification requirements of Megan's Law. *Id.*

■ Such is not the case in Delaware. The various provisions in the Delaware Family Court Rules relating to confidentiality and the sealing of that court's records became effective January 1, 1987, and related statutory provisions all preceded the March 1, 1999 effective date of the Delaware sex offender community notification provisions. *See* Del.Fam.Ct.Cr.R. 1(c) and Civ.R. 86; 10 *Del.C.* §§ 1001, 1002; 11 *Del.C.* § 4121. Moreover, the Delaware General Assembly's intent to include juveniles, without regard to age, within the scope of the Sex Offender Registration Statute is explicit in this respect. *See* 11 *Del.C.* § 4121(a)(4)(b) (" 'Sex offender' means ... [a]ny juvenile who is adjudicated delinquent after June 27, 1994, of any offense which would constitute any of the offenses set forth in subparagraph a. of this paragraph if he or she had been charged as an adult").

Finally, although we are aware that the juvenile justice system places emphasis on the best interests of the child, sex offenders of any age present unique problems.

The General Assembly enacted the Sex Offender Registration Statute in an effort to protect society from both the adult and the youthful sex offender. We recognize that sexual offenses encompass a range of very different kinds of conduct implying varying degrees of seriousness and that recidivism rates may change significantly depending on the offender's circumstances. The Delaware General Assembly chose to condition application of the statute on the seriousness of the offense committed. Whether application of the statute should be contingent upon the juvenile's age, or whether age is a factor in determining tier assignment is essentially a policy determination best left to the legislature.

## VII

For the foregoing reasons, we conclude that the community notification scheme of Delaware's sex offender registration law offends neither the State or Federal Constitution generally or as applied to juveniles. The decision of the Family Court is Affirmed.