# IN THE SUPREME COURT OF THE STATE OF DELAWARE

THE HONORABLE ANTHONY J.
ALBENCE, in his official capacity as
State Election Commissioner, and
STATE OF DELAWARE
DEPARTMENT OF ELECTIONS,

    Defendants Below,
    Appellants/Cross-Appellees,

          v.

MICHAEL HIGGIN and MICHAEL
MENNELLA,

    Plaintiffs Below,
    Appellees/Cross-Appellants.

§
§
§
§
§
§
§
§
§ No. 342, 2022
§
§ Court Below: Court of Chancery
§ of the State of Delaware
§
§ C.A. Nos.   2022-0641
§             2022-0644
§
§
§

_____

DELAWARE DEPARTMENT
OF ELECTIONS and ANTHONY J.
ALBENCE, State Election
Commissioner,

    Defendants Below,
    Appellants,

          v.

AYONNE "NICK" MILES, PAUL J.
FALKOWSKI, and NANCY M.
SMITH,

    Plaintiffs Below,
    Appellees.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Submitted: October 6, 2022
Decided:  December 13, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, Justices and **JURDEN**, President Judge[1] constituting the Court *en banc*.

Upon appeal from the Court of Chancery. **AFFIRMED** in part, **REVERSED** in part.

Alexander S. Mackler, Esquire, Allison J. McCowan, Esquire, Zi-Xiang Shen, Esquire, and Victoria R. Sweeney, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellants/Cross-Appellees The Honorable Anthony J. Albence and the State of Delaware Department of Elections*.

M. Jane Brady, Esquire, BRADY LEGAL GROUP LLC, Lewes, Delaware, *for Appellees/Cross-Appellants Michael Higgin and Michael Mennella.*

Charlotte Davis, Esquire and Noel H. Johnson, Esquire, PUBLIC INTEREST LEGAL FOUNDATION, Indianapolis, Indiana, *for Appellee/Cross-Appellant Michael Mennella.*

Julianne E. Murray, Esquire, LAW OFFICE OF MURRAY, PHILLIPS & GAY, Georgetown, Delaware, *for Appellees Ayonee "Nick" Miles, Paul J. Falkowski and Nancy Smith.*

---

[1] Sitting by designation under Del. Const. art. IV, § 12 and Supreme Court Rules 2(a) and 4(a) to complete the quorum.

**TRAYNOR**, Justice:

On July 22, 2022, Governor John C. Carney, Jr., signed into law two pieces of legislation affecting how the citizens of our State register to vote and cast their ballots. Under one bill—what this opinion will refer to as the Same-Day Registration Statute—the deadline for registering to vote in any presidential primary, primary, special, and general election was changed from the fourth Saturday before the date of the election to the day of the election. Under the other bill, the General Assembly enacted and the Governor approved the addition of a chapter entitled "Voting by mail ballot" to Title 15 of the Delaware Code, which contains the statutes governing elections in our State. This new chapter, which we will call the Vote-by-Mail Statute, and which applies to non-presidential primary, special, and general elections, authorized[2] all Delaware voters to cast their ballots by mail whether or not they are able to appear at a polling place.

On the very day the Governor approved the bills, two lawsuits were filed challenging the constitutionality of both enactments under various sections of Article V of the Delaware Constitution. Two sections are relevant to this appeal. Section 4 addresses voter registration and, among other things, directs the General Assembly

---

[2] Our choice of tense throughout this opinion takes into account that we announced our unanimous decision in an Order entered on October 7, 2022, two months before the issuance of this opinion.

to "enact uniform laws for the registration of voters in this State." It also calls for establishing "at least two registration days" within a window preceding each general election—a window that is to close no less than ten days before the election. Section 4A is entitled "General laws for absentee voting" and, as its name suggests, requires the General Assembly to enact laws providing that citizens who are unable to appear in person at their regular polling place for a general election for certain specified reasons may nonetheless cast a ballot, presumably by mail.

The Plaintiffs sought declaratory and injunctive relief in the Court of Chancery, contending that the Same-Day Registration Statute conflicts with Section 4, while the Vote-by-Mail Statute runs afoul of Section 4A. The Defendants—the Department of Elections and the State Election Commissioner[3]—responded that the Plaintiffs—voters, a candidate for political office, and an election inspector—lacked standing to challenge the laws but that, even if they had standing, the laws were within the General Assembly's plenary power to enact and therefore valid. Because the general election was set for November 8, 2022, and the Department hoped to mail ballots to potential voters by October 10, 2022, litigation in the Court of Chancery was expedited.

---

[3] In this Opinion, the Department of Elections and the State Election Commissioner will be referred to together as the "Department."

In an opinion issued two weeks after oral argument on the parties' cross-motions for summary judgment, the Court of Chancery rejected the Defendants' standing argument, but upheld the validity of the Same-Day Registration Statute, citing "the strong presumption of constitutionality [] and the advisability of keeping the existing statutory scheme harmonious."[4] The court, however, invalidated the Vote-by-Mail Statute, not because it found clear and convincing evidence of an express or implied prohibition of voting by mail in the Constitution, but because it felt constrained by three relevant precedents—one by this Court, another by three Justices of this Court in an advisory opinion, and the other by the erstwhile Court of General Sessions. Obviously unpersuaded by those opinions, the Court of Chancery invited this Court to revisit them, and the Defendants joined in the invitation by promptly appealing. For their part, the Plaintiffs cross-appealed, claiming that the Court of Chancery's rejection of their challenge to the Same-Day Registration Statute was erroneous. Like the Court of Chancery, we agreed to expedite proceedings in this Court.

After expedited briefing and oral argument in this Court, we first determined that one of the Plaintiffs, who was participating as a candidate for State Representative in the impending election, had standing to challenge both statutes.

---

[4] *Higgin v. Albence,* 2022 WL 4239590, at *19 (Del. Ch. Sept. 14, 2022).

5

We then entered an order announcing our unanimous conclusion that neither of the newly enacted laws passes muster under the Delaware Constitution.[5] Because of the press of time, we were unable then to publish a full opinion explaining the reasons underpinning that conclusion but promised to do so in due course. This opinion fulfills that promise.

As will be seen, our analysis of the constitutionality of the Vote-by-Mail Statute is influenced by the historical context of Section 4A's adoption and the longstanding interpretation of its scope. Our analysis of the Same-Day Registration Statute, on the other hand, is more textually driven, turning in large part on its discordance with certain procedural provisions mandated by Article V, Section 4.

The Vote-by-Mail Statute runs counter to a time-honored understanding shared by our courts, the General Assembly, and the Department, that the General Assembly is not free to limit or enlarge upon the categories of citizens specifically enumerated in Section 4A who need not vote in person in general elections. And the Same-Day Registration Statute effectively eliminated the rights—explicitly granted in Section 4—of interested persons to appeal "[f]rom the decision of registration officers granting or refusing registration, or striking or refusing to strike a name or

---

[5] *Albence v. Higgin*, 2022 WL 5333790 (Del. Oct. 7, 2022).

names from the registration list."[6]  The statute would also undermine Section 4's provisions allowing for the correction of voter registrations "at any time prior to the day of holding the election."[7]  We therefore affirm in part and reverse in part the Court of Chancery's judgment.

## I.    BACKGROUND

As we begin our inquiry into whether the challenged election laws are in line or at odds with Article V of the Delaware Constitution, we take our bearings from the historical context in which the relevant constitutional provisions were adopted, interpreted, and, from time to time, amended.

### A.  Colonial Period and the Constitution of 1776

Our state constitutional history dates back to the momentous summer of 1776 following the Continental Congress's resolution in May of that year urging the colonies "to adopt such government as shall in the opinion of the representatives of the people best conduce to the happiness and safety of their constituents in particular and America in general."[8]  Delaware responded by convening thirty delegates—ten from each county—from among the leaders of Delaware's colonial government.[9]

---

[6] DEL. CONST. art. V, § 4
[7] *Id.*
[8] RANDY J. HOLLAND, THE DELAWARE STATE CONSTITUTION 7 (2d ed. 2017).
[9] *See id.* at 7–8.

Before turning to the task of adopting a constitution, however, the Convention of 1776 adopted the Declaration of Rights and Fundamental Rules of the Delaware State (enacted September 11, 1776). The Declaration of Rights, which was similar to bills of rights adopted by Maryland and Pennsylvania, both of whom based their declaration on Virginia's historic Declaration of Rights, stressed the importance of the citizens' right to vote:

> SECT. 6. That the right of the people to participate in the Legislature, is the foundation of liberty and of all free government, and for this end all elections ought to be free and frequent, and every freeman, having sufficient evidence of a permanent common interest with, and attachment to the community, hath a right of suffrage.[10]

Nine days after enacting the Declaration of Rights, the Convention adopted Delaware's first state constitution, which declared that "[t]he right of suffrage in the election of Members for both Houses [of the General Assembly] shall remain as exercised by law at present . . ." with a "President [] or Chief Magistrate . . . [to] be chosen by joint ballot of both Houses."[11]

The historical record shows that, during the colonial era—that is, the period preceding the adoption of the Constitution of 1776—in-person voting was required. Under a 1700 "Act for regulating elections, and ascertaining the number of the

---

[10] Del. Declaration of Rights § 6 (1776).
[11] DEL. CONST. of 1776, art. 5.

8

Members of Assembly"[12]—a statute enacted for "the well governing . . . of counties of New-Castle, Kent, and Sussex," . . . both the date and location of elections for the Assembly were set:

> [I]t shall and may be lawful to and for the freemen and inhabitants of the respective counties of this government . . . *to meet* on the first day of October yearly, for ever, at the most usual *place* of elections in the said respective counties; that is to say, for the county of New-Castle, at the court-house in the town of New-Castle: For the county of Kent, at the court-house in the town of Dover: And for the county of Sussex, at the court-house in the town of Lewes: . . . And *then and there* chuse their Representative or Delegates to serve them in Assembly . . . . And that every person within this government, qualified to elect according to the direction of this act, refusing or neglecting (not being hindered by sickness or other unavoidable accident) to *attend* at the election, and to give in his vote ... shall be fined the sum of Twenty Shillings . . . .[13]

Thus, the Act not only designated the date and locations of the annual elections, it mandated the personal attendance of all eligible voters unless excused by illness or accident.

That the framers of the 1776 Constitution intended to perpetuate the in-person voting requirements is further evidenced by Articles 27 and 28 of the document. Article 27, for instance, echoing the 1700 Act, stipulates that "[t]he first election for the General Assembly of this state shall be held on the twenty-first day of October

---

[12] 1 Del. Laws ch. LXI. a., 146.
[13] *Id*. at 147 (emphases added).

next, *at the Court Houses* in the several counties, in the manner heretofore used in the election of the Assembly . . . ."[14]  And Article 28 could hardly be more evocative of an electoral process that envisions voters appearing in person to cast their votes:

> ART. 28.  To prevent any violence or force being used at the said elections, no persons shall come armed to any of them; and no muster of the militia shall be made on that day, nor shall any battalion or company give in their votes immediately succeeding each other, if any other voter who offers to vote objects thereto; nor shall any battalion or company in the pay of the Continent, or of this or any other state, be suffered to remain at the time and place of holding the said elections, nor within one mile of the said places respectively for twenty-four hours before the opening said elections, nor within twenty-four hours after the same are closed, so as in any manner to impede the freely and conveniently carrying on the said election:  *Provided always*, That every elector may in a peaceable and orderly manner give in his vote on the said day of election.[15]

Thus, at the founding of "The Delaware State,"[16] our constitution required voters to cast their ballots in person.

## B.  The Constitution of 1792

The Constitution of 1776, like the federal Articles of Confederation, was short lived.  In the wake of the adoption of the United States Constitution—ratified first

---

[14] DEL. CONST. of 1776, art. 27 (emphasis added).

[15] DEL. CONST. of 1776, art. 28 (italics in original).

[16] DEL. CONST. of 1776, art. 1 ("The government of the counties of New-Castle, Kent and Sussex, upon Delaware, shall hereafter in all public and other writings be called *The Delaware State*.") (italics in original).

by Delaware on December 7, 1787—a convention, presided over by John Dickinson, again met in Dover to consider defects in the 1776 Constitution.

In the Convention's eventual report to the General Assembly, it noted that the Constitution of 1776 was "so very deficient, and inadequate to the great purposes of government, that they became obliged, from a duty they owed to their constituents, to propose an almost entire new plan."[17] On June 12, 1792, the new constitution was signed by the requisite number of delegates, and "Delaware had its second constitution."[18]

The 1792 Constitution provided "the basic framework for Delaware's government for more than a century, until the adoption of the current Constitution in 1897."[19] Under that framework, in-person voting remained the constitutional norm. All elections were, according to Article I, Section 3, to be "free and equal,"[20] and under Article IV, Section 21, "by ballot."[21] These provisions, standing alone, did not mandate in-person voting. But Section 3 of Article IV clearly contemplated in-person voting: "Electors shall in all cases except treason, felony, or breach of the

---

[17] HOLLAND, *supra* note 8, at 12.
[18] *Id.* at 13.
[19] *Id.*
[20] DEL. CONST. of 1792, art. I, § 3.
[21] DEL. CONST. of 1792, art. IV, § 1.

peace, be privileged from arrest during *their attendance at elections, and in going to, and returning from them.*"[22]

## C. The Constitution of 1831 and the Civil War

Delaware's third constitution, which, according to Justice Holland, "is more accurately regarded as a modification of the 1792 Constitution[,]"[23] was adopted in 1831. The 1831 Constitution retained the basic election framework found in its predecessor. For example, the 1792 Constitution's provisions that elections be "free and equal"[24] and that established a privilege from arrest "during [voters'] attendance at elections, and in going to and returning from them []"[25] remained intact. The new constitution did, however, add two provisions of arguable relevance to the case before us.[26] Section 1 of Article IV, provided that:

> [a]ll elections for Governor, Senators, Representatives, Sheriffs and Coroners shall be held on the Tuesday next after the first Monday in the month of November of the year in which they are to be held, and be by ballot.
>
> But the legislature may by law prescribe the means, methods and instruments of voting so as to best secure secrecy and the independence of the voter; preserve the freedom and purity of elections and prevent fraud, corruption and intimidation thereat.

---

[22] DEL. CONST. of 1792, art. IV, § 2 (emphasis added).
[23] HOLLAND, *supra* note 8, at 17.
[24] DEL. CONST. of 1831, art. I, § 3.
[25] DEL. CONST. of 1831, art. IV, § 2.
[26] Article IV of the 1831 Constitution contained other new provisions, but they deal largely with voter qualifications—an issue not directly relevant to our opinion.

12

Three decades after the 1831 Constitution was adopted, the American Civil War "inspired the first major effort for absentee balloting in the United States."[27] As one scholar explained,

> [l]arge numbers of young men who were eligible to vote served in the armies of both the Union and the Confederacy, and, as the 1864 presidential elections approached, spirited legislative battles erupted in the state legislatures over the question of allowing soldiers stationed away from home to cast votes in their home states. In the Union states, some of the impetus behind these battles was partisan, with Republicans pushing for soldier-voting and Democrats opposing these efforts because the soldier vote was for Lincoln.[28]

This partisan divide manifested itself in the Delaware General Assembly in February 1862 when a bill was introduced in the House giving soldiers serving in the Union Army the right to vote outside the State.[29] Predictably, the bill foundered: ten Republicans voting in favor and 11 Democrats voting against it.[30]

## D. Delaware's Current Constitution: The Constitution of 1897

Delaware's fifth constitutional convention—a convention in 1853 produced a proposed new constitution, but it was soundly rejected by the electorate[31]—was held

---

[27] John C. Fortier and Norman Ornstein, *The Absentee Ballot and the Secret Ballot*, 36 U. MICH. V.L. REFORM 483, 492 (2003).

[28] JOHN C. FORTIER, ABSENTEE AND EARLY VOTING: TRENDS, PROMISES, AND PERILS 7 (2006).

[29] JOSIAH HENRY BENTON, VOTING IN THE FIELD: A FORGOTTEN CHAPTER OF THE CIVIL WAR 266–67 (Forgotten Books 2018) (1915).

[30] *Id.* at 267.

[31] According to Justice Holland's survey of our state constitutional history, "as part of resolving [a] dispute over the legitimacy of the [1853] Convention, the delegates had unanimously decided to submit the final product to the people of Delaware for ratification." HOLLAND, *supra* note 8, at 21.

in 1897. Drafted, debated, and adopted that same year, the 1897 Constitution is our State's fourth, and current, constitution.[32] It contains seventeen Articles, most of which contain multiple sections, and, as of 2017, the General Assembly had adopted more than 90 amendments. Relevant to the issues before us now, Article V, consisting of thirteen sections, encompasses a comprehensive framework for the administration of elections.[33] For present purposes, we train our attention on Sections 1, 2, 3, 4, 4A, and 5.

Section 1 of Article V establishes the "time"—"biennially on the Tuesday next after the first Monday in the month of November"—and the "manner"—by ballot—of holding general elections. Section 1 also authorizes the General Assembly to "prescribe the means, methods and instruments of voting so as to best secure secrecy and the independence of the voter, preserve the freedom and purity of elections and prevent fraud, corruption and intimidation thereat."[34] This provision is identical to the first two paragraphs of Article IV, Section 1 of the 1831 Constitution and has remained unaltered since its adoption.

Section 2 addresses voter qualifications for voting, providing in pertinent part that:

---

[32] *Id.* at 24.
[33] *Id.* at 207.
[34] DEL. CONST. art. V, § 1.

Every citizen of this State of the age of twenty-one years who shall have been a resident thereof one year next preceding an election, and for the last three months a resident of the county, and for the last thirty days a resident of the hundred or election district in which he or she may offer to vote, and in which he or she shall have been duly registered as hereinafter provided for, shall be entitled to vote at such election in the hundred or election district of which he or she shall at the time be a resident, and in which he or she shall be registered[.][35]

Section 3 prohibits the recipients of bribes from voting "at any general or special or municipal election in this State[.]"[36] This section allows for challenges of voters on bribery or improper-influencing grounds "before the officers authorized for that purpose . . . ."[37] The challenged voter must then "swear or affirm before such officers" a denial of the charge, and upon such oath, is permitted to vote "at such election."[38] As will be seen, the right to challenge a voter on a charge of bribery figured prominently in a 1939 determination that an absentee-voting statute was unconstitutional.

Section 4, which lies at the heart of the Plaintiffs' challenge to the Same-Day Registration Statute, contains the Constitution's voter-registration framework. Because Section 4 was the subject of an amendment in 1925, which the Court of

---

[35] DEL. CONST. art. V, § 2.
[36] DEL. CONST. art. V, § 3.
[37] Id.
[38] Id.

Chancery found particularly relevant to its analysis, we do well here to compare the relevant provisions as adopted in 1897 with their current format.

The original version of Section 4 directed "[t]he General Assembly . . . [to] provide by law for a uniform biennial registration of all the voters in this State who possess the qualifications prescribed in this Article . . . ."[39] The current version retains the uniformity requirement, using slightly different language: "The General Assembly shall enact uniform laws for the registration of voters in this State entitled to vote under this Article . . . ."[40] The 1897 version of Section 4 also designated a time when registration would occur:

> *Such registration shall be commenced* not more than one hundred and twenty days nor less than sixty days before *and be completed* not more than twenty days nor less than ten days before such election. Application for registration may be made on at least five days during the said period; provided, however, that *such registration may be corrected as hereinafter provided, at any time prior to the day of holding the election.*[41]

As the Court of Chancery noted, the General Assembly amended Section 4, replacing the above-quoted provision with similar—though not identical—verbiage:

> *There shall be at least two registration days in a period commencing not more than one hundred and twenty days, nor less than sixty days before, and ending not more than twenty days, nor less than ten days before, each General Election*, on which registration days persons whose names are not on the list

---

[39] DEL. CONST art. V, § 4 (amended 1925).
[40] DEL. CONST. art. V, § 4.
[41] DEL. CONST art. V, § 4 (amended 1925) (emphases added).

16

of registered voters established by law for such election, may apply for registration, and on which registration days applications may be made to strike from the said registration list names of persons on said list who are not eligible to vote at such election; provided, however that *such registration may* be corrected as *hereinafter provided at any time prior to the day of holding the election.*[42]

The penultimate paragraphs of both the 1897 and current versions of Section 4 are identical and contain two procedural mechanisms that are integral to the registration process: appeal and correction. Section 4 provides that a registration officer's decision granting or refusing registration, may be appealed by "any person interested, or any registration officer . . . to the resident Associate Judge of the County."[43] According to the pre-eminent expert on our state constitutional law, the purpose of the right of appeal to a member of the judiciary is "to insure to all qualified electors in the State the right to qualify and vote, without hindrance."[44]

The judge considering an appeal

shall have power to order any name improperly omitted from the . . . registry to be placed thereon, and any name improperly appearing on the said registry to be stricken therefrom, and any name appearing on the said registry, in any manner incorrect, to be corrected, and to make and enforce all necessary orders in the premises for the correction of the said registry.[45]

---

[42] DEL. CONST. art. V, § 4 (emphases added).
[43] DEL. CONST. art. XVII, § 4.
[44] HOLLAND, *supra* note 8, at 214 (quoting *Appeal of Brown*, 49 A.2d 618, 622 (Del. Super. 1946)).
[45] DEL. CONST. art. V, § 4.

Consequential to us now is Section 4's stipulation that registrations "may be corrected . . . at any time prior to the day of holding the election."[46]

Finally, before turning to Section 4A, which is titled "General laws for absentee voting" and thus occupies center stage in our analysis of the challenged Vote-by-Mail Statute, we touch briefly on Section 5 of Article V. Employing the very same words used by the drafters of our 1792 and 1831 Constitutions, the current version of Section 5, adopted in 1897, provides that: "Electors shall in all cases except treason, felony, or breach of peace, be privileged from arrest, during their attendance at elections, and in going to and returning from them."[47]

In sum, leaving Section 4A's absentee voting provisions aside for the moment, all the sections of Article V discussed above seem to take for granted that elections are held in some identifiable place. To recap, Section 1 seeks to "prevent fraud, corruption and intimidation *thereat*."[48] Section 2 speaks of eligible voters who are "entitled to vote *at such election in the hundred or election district of which he or she shall at the time be a resident . . . .*"[49] Section 3's anti-bribery provisions are concerned with whether a person should be allowed to "vote *at* such election."[50]

---

[46] *Id.*
[47] DEL. CONST. art. V, § 5.
[48] DEL. CONST. art. V, § 1.
[49] DEL. CONST. art. V, § 2.
[50] DEL. CONST. art. V, § 3.

Likewise, Section 4's registration provisions govern "the right of every person so registered to vote *at any General Election*."[51]  And if the simple preposition "at" does not adequately denote a physical place, Section 5's reference to "attendance at elections and . . . going to and returning from them"[52] should suffice.

### E.      The 1923 Absentee Voting Statute and *State v. Lyons*

We now digress to discuss the events leading to the General Assembly's amendment of Article V and the addition of Section 4A in the early 1940s, entitled "General laws for absentee voting."

In 1923, the 99th Session of the General Assembly passed "AN ACT to permit voting by persons not present at the polling places, under certain circumstances and conditions."[53]  Section 1 of the Act provided:

> That any qualified elector of this State, duly registered, who may be in the public service of the United States of America or of this State, and who because of such public service, or who because of the nature of his work or business, may be absent, or may expect to be absent, from this State, or from the election district in which he or she is a qualified elector, or who because of sickness or physical disability cannot appear at the polling place in such district, on the day of holding any general election, may vote at such election as hereinafter provided.[54]

---

[51] DEL. CONST. art. V, § 4.
[52] DEL. CONST. art. V, § 5.
[53] 33 Del. Laws ch. 103, 258.
[54] *Id*.  The Court of Chancery's characterization of the 1923 absentee-voting statute as "broad" cannot be squared with the statute's text.  *See Higgin*, 2022 WL 4239590, at *26–27.  The statute, whose title itself implies limitation, was strictly limited, similarly to Section 4A as initially adopted, to qualified electors "who may be in the public service of the United States of America or of this State, and who because of such public service, or who because of the nature of his work

The constitutionality of this statute was challenged in 1939 in *State v. Lyons*.[55] The defendants challenged an indictment alleging that they had conspired to abet fraud in connection with votes cast under the 1923 absentee-voting act on the grounds that the act conflicted with Section 2 of Article 5. They pointed to certain "critical words [in Section 2] and those most requiring consideration[:]" namely, those identifying eligible voters as "male citizen[s] . . . [who are] resident(s) of the hundred or election district *in which [they] may offer to vote . . . .*"[56] This language, the defendants claimed, indicated "the place where the election is to be held . . . [and] contemplated the personal attendance of voters at the polls."[57]

---

or business, may be absent, or may expect to be absent, from this State, or from the election district in which he or she is a qualified elector, or who because of sickness or physical disability cannot appear at the polling place in such district, on the day of holding any general election. . . ." 33 Del. Laws ch. 103, § 1, 258. Electors who sought the benefit of the statute because of sickness or physical disability were required to attach their application for an absentee ballot "a certificate[] of a duly licensed practicing physician certifying as to such sickness or disability. . . ." *Id*. at § 3, 259. That the right to an absentee ballot was to be carefully circumscribed is further evidenced by Section 14 of the 1923 act: "Section 14. In so far as the provisions of this Act shall apply to voters by reason of the nature of their work or business, it is intended that those qualified electors, duly registered, who may vote under the provisions of this Act shall be those *only* who may be absent, or may expect to be absent, from the polling place in the election district in which he or she may be a qualified elector because of the inherent nature of his or her work or business, such as commercial travelers, rail-road employees, pilots and sailors, and *not merely because such electors may find it more convenient* to follow his or her work or employment in localities other than those in which they may reside such as mechanics, farm workers and other ordinary laborers." *Id*. at § 14, 264 (emphasis added).

[55] 5 A.2d 495 (Del. Gen. Sess. 1939).

[56] DEL. CONST. art. V, § 2 (emphasis added), *quoted in Lyons*, 5 A.2d. at 500.

[57] *Lyons*, 5 A.2d at 500.

The Court of General Sessions[58] agreed with the defendants, but nevertheless recognized that this conclusion, standing alone, did not mean that the General Assembly could not "enact a law by which, under prescribed conditions, certain absentee electors could vote."[59] That was so because in the court's words:

> It is not necessary that express power be given by the Constitution to the Legislature to enact legislation regarding elections, or legalizing the casting of votes by absentee voters. The Constitution does not consist of a series of powers expressly delegated to the people, acting through the Legislature. Rather the power of the Legislature exists, except in so far as expressly or impliedly limited by the Constitution. Whether the language "offer to vote" contemplates a personal attendance by the voter and a personal casting of the vote can only be correctly determined by a consideration of all the material and pertinent provisions of the Constitution.[60]

Two principal considerations ultimately led the Court of General Sessions to conclude that the Constitution as it then existed required the personal attendance of the voter at the polls and that "no power . . . existed[ed] in the Legislature to provide for absentee voting."[61] First, a review of the debates during the Constitutional

---

[58] The 1792 and 1831 Constitutions established a Court of General Sessions of the Peace and Jail Delivery, while the 1897 Constitution called for a Court of General Sessions. Under the 1897 Constitution the court was responsible for, among other things, trying non-capital criminal cases. The court was abolished in 1951, and its responsibilities were assumed by the newly organized Superior Court. *See* 48 Del. Laws ch. 109, 221. *See also Court of General Sessions*, DELAWARE PUBLIC ARCHIVES (last visited December 7, 2022), https://archives.delaware.gov/delaware-agency-histories/court-of-general-sessions/ (discussing the history of Delaware's Court of General Sessions).

[59] *Lyons*, 5 A.2d at 500.

[60] *Id.*

[61] *Id*. at 503.

21

Convention of 1897 persuaded the court in no uncertain terms that the Convention intentionally omitted provisions that would have authorized the type of absentee voting found in the 1923 Act:

> It is . . . an inescapable fact that the direct question of absentee voting came before the Convention and was intentionally eliminated in so far as citizens in actual military service were concerned. The inference is unmistakable that the Convention expressly refrained from providing for absentee voting, but left the Constitution as it theretofore had been.[62]

The second influential consideration supporting the court's conclusion was the process set forth in Section 3 of Article 5 for challenging voters at the polls on the ground of bribery. The court observed that "[n]o voter can meet that challenge without his personal presence at the polls" and that "[a] challenged vote at the polls can only be received and counted when the voter is personally present to meet the challenge."[63] Unable to reconcile the 1923 Act with these considerations, the court understood that it was its "plain duty . . . to hold the statute unconstitutional, leaving the perfection of the statute to be brought about by proper constitutional amendment."[64]

---

[62] *Id*. at 502.
[63] *Id*.
[64] *Id*. at 503.

**F. The Adoption of Section 4A**

Two years after *Lyons* struck down the 1923 Act, the 108th Session of the General Assembly heeded the Court of General Session's reproof and approved a constitutional amendment, adding Section 4A to Article V of the Delaware Constitution. Though not a verbatim version of the ill-fated 1923 Act, the operative provisions of Section 4A were functionally equivalent to the statute's:

> Section 4A. The General Assembly shall enact general laws providing that any qualified elector of this State, duly registered, who shall be unable to appear to cast his or her ballot at any general election at the regular polling place of the election district in which he or she is registered, either because of being in the public service of the United States or of this State, or because of the nature of his or her business or occupation, or because of his or her sickness or physical disability, may cast a ballot at such general election to be counted in such election district.[65]

Because amending the Delaware Constitution by the General Assembly is a "two-legged" process requiring the approval of two-thirds of the members of both Houses by two successive General Assemblies,[66] Section 4A did not become part of the Constitution upon both Houses' approval in May 1941. But it was officially adopted when the 109th Session of the General Assembly completed the "second leg"

---

[65] 43 Del. Laws ch. 1, 3 (approved May 9, 1941).
[66] DEL. CONST. art. XVI, § 1. Article XVI contains two different procedures for amending the constitution—a supermajority vote of both Houses of two successive General Assemblies described above and a constitutional convention procedure set forth in Section 2 of Article XVI. In our history, the only proposal submitted to a popular referendum was, as briefly described above, the failed 1853 Constitution.

23

of the amendment process in 1943 and, since that year, the Delaware Constitution's "General laws for absentee voting" have resided in Section 4A of Article V.

### G.  The Soldiers' Vote Act and *Harrington*

The same year that Section 4A cleared the "second leg" and became part of our Constitution, a second blow befell the cause of voting other than at a traditional polling place when this Court decided *State ex rel. Walker v. Harrington*,[67] addressing the constitutionality of the "Soldiers' Vote Act."  Under this Act, adopted in 1898 on the eve of the Spanish American War, qualified voters of this State who were in the military service of this State or the United States were authorized to cast their votes at their place of encampment.  Unlike the absentee-voting statute struck down in *Lyons*, the Soldier's Vote Act required, among other things, the opening of a poll "in each company at the quarters of the captain,"[68] which was to remain open between specific hours.  It also required the presence of election judges at the "polling place[s]"[69] who, upon the challenge of any voter, were authorized to examine voters under oath and to determine the voter's right to vote.  The Act also directed the Governor to designate two persons from different political parties, whose duties were to visit the encampments, deliver registration lists and ballots,

---

[67] 30 A.2d. 688 (Del. 1943).
[68] 21 Del. Laws ch. 39, § 2, 134.  *See also* Revised Code of Del., ch. 60, art. 4, § 118 (1935).
[69] 21 Del. Laws ch. 39, § 4, 134.

close the polls, and return the ballots to this State. In brief, the Soldiers' Vote Act purported to set up an extra-territorial polling place and, as such, differed essentially from the 1923 absentee voting statute.

When the constitutionality of the Soldiers' Act was challenged in the wake of the 1940 election, the Court juxtaposed the Act with Article V's provisions and found it wanting, principally on three grounds. First, the *Harrington* Court noted that the Act was incompatible with Section 3's bribery-challenge provision.[70] The Court next pointed to Section 5:

> If [Section 3] is not sufficient to imply that the drafters of the Constitution intended that electors, when offering to vote must personally appear at polling places within the limits of the State, for their respective hundreds or districts, then all doubt can be removed by reference to Section 5, of Article V of the Constitution, wherein it is provided that "Electors shall in all cases, except treason, felony, or breach of the peace, be privileged from arrest, during their attendance at elections, and in going to and returning from them."[71]

And finally, the Court concluded that the Act's provisions for determining the state of the election were "irreconcilably antagonistic" to the procedures governing the Board of Canvass's and the Superior Court's post-election responsibilities. In the *Harrington* Court's view, "both from the letter and the spirit of the Constitution, there is no reasonable ground to doubt but that it requires the polling places for the

---

[70] *Harrington*, 30 A.2d at 692.
[71] *Id.* at 692.

25

reception of ballots at general elections held in this State to be located within the territorial limits of the State."[72]

This conclusion would not seem to bear directly on the questions we must answer in this case. But in response to the amici curiae's suggestion that under the Soldiers' Vote Act—unlike under the 1923 absentee-voting statute—the voter is personally present at a polling place and subject to challenge, the Court remarked:

> The Constitution, by Section 4, Article V, has prescribed for uniform laws for registration of voters for the purpose of determining that prospective voters duly possess the necessary and prescribed qualifications. This section provides that all questions of the qualifications of voters should be determined before election day, and on that day, beyond the fact of the identity of the persons, the sole ground of challenge should be the violation of said Section 3 of Article V.[73]

## H. The 1972 Opinion of the Justices

The next significant development relevant to our historical discussion—and later, to our analysis—occurred in 1972. In that year, Governor Russell W. Peterson, acting under 29 *Del C.* §2102,[74] propounded three questions to the members of this

---

[72] *Id.* at 693.
[73] *Id.* at 691.
[74] Under 29 *Del. C.* § 2102, "[t]he Governor may, whenever the Governor requires it for public information or to enable the Governor to discharge the duties of office with fidelity, request the members of the Supreme Court to give their opinions in writing touching the proper construction of any provision in the Constitution of this State or of the United States or the constitutionality of any law enacted by the General Assembly of this State."

Court.[75]  Two of the questions inquired into the constitutionality of the then-existing absentee-voting statute, 15 *Del. C.* §5503, as it related to primary elections, and the third asked the more general question:  "May the General Assembly constitutionally provide by statute for absentee voting by any person in an election other than a general election?"[76]

The Justices took up the third question first.  Noting that, under the residual-power doctrine, "the General Assembly has all legislative power not expressly or impliedly limited by the Constitution[,]" Chief Justice Wolcott, Justice Carey, and then-Justice Hermann[77] answered the question in the affirmative with one voice:

> [I]t is not necessary to find in the Constitution an express grant to the General Assembly of authority to provide for absentee voting in primary elections; the inquiry is whether there is any limitation in the Constitution upon the power of the General Assembly to do so.  In the absence of such constitutional limitation, the power of the General Assembly to provide for absentee voting in primary elections, as it has done in [§] 5503, is unquestionable.
>
> We find in the Constitution no limitation of the General Assembly to legislate in this field.[78]

---

[75] *Opinion of the Justices*, 295 A.2d 718 (Del. 1972).

[76] *Id*. at 720.

[77] We refer to the members of the Court individually as the statute authorizing the Governor to seek advisory opinions contemplates that the members of the Court will, in their discretion, "give their opinions."  21 *Del. C.* § 2102.  *See also* HOLLAND, *supra* note 8, at 181 ("The justices of the Supreme Court *as individuals* . . . are authorized by statute to issue advisory opinions in certain situations.")  (emphasis added).

[78] *Opinion of the Justices*, 295 A.2d at 720.

They concluded, moreover, that based on Article V, Section 7's "express recognition of the existence and nature of primary elections"—that is, as being "within the special province of the political parties, to be conducted by them under party rules and regulations"[79]—the framers had "intentionally and successfully avoided any limitation upon the legislative powers of the General Assembly as to primary elections."[80]   Notably, however, the Justices contrasted this intentional limitation with the implied limitation upon absentee voting in general elections identified in *Lyons* and *Harrington*.

The Justices then circled back and tackled the first question:  Did 15 *Del C*. § 5503(3), as recently amended, violate the Delaware Constitution's requirement of free and equal elections found in Article I, Section 3, and the United States Constitution's equal protection clause, by denying the right to vote in primary elections to persons unavoidably absent on primary election day, while granting that right to persons unavoidably absent on the day of the general election?  The genesis of this question was the amended statute's identification of qualified electors who are "unavoidably absent from the county in which he resides on the day of the general election" as persons eligible to vote by absentee ballot.

---

[79] *Id*. at 721.
[80] *Id*.

Although the amended statute appeared to broaden the scope of absentee voting to include "unavoidably absent" voters heedless of the reason for their absence, the Governor's questions did not explicitly encompass that issue. Put differently, the Governor did not ask the Justices to opine on the authority of the General Assembly to enact a statute that expanded the categories of voters entitled to absentee-voting privileges beyond those enumerated in Section 4A.

Sticking to the question as asked by the Governor, the Justices surmised that, when the scope of § 5503 was enlarged to cover "any general election, primary election, choosing candidates for statewide or local officers, or special election held under the provisions of Chapter 73 of this title," the General Assembly had negligently failed to enlarge the "unavoidably absent" provision to reflect the basic enlargement.[81] The Justices therefore concluded that subparagraph 5503(3) should be read as "(3) Unavoidably absent from the county in which he resides on the day of the election, or ***."[82] Because this reading would eliminate the constitutional problem raised by the Governor's first question, the Justices answered the question in the negative.

---

[81] *Id.* at 722.
[82] *Id.*

But the answer to the specific question asked left the impression—or so it seems to us—that the Justices were placing their stamps of approval on the expansion of the class of voters who would be eligible for absentee voting. Hence, the Justices offered a caveat of direct relevance to this issue before us now:

> But there is a caveat as to general elections in this connection: Del. Const. Art. 5, [§] 4A specifically enumerates the classifications of persons eligible to vote by absentee ballot at general elections. We are of the opinion that by expressly including certain classifications, the drafters of [§] 4A impliedly excluded all other classifications. It is beyond the power of the Legislature, in our opinion, to either limit or enlarge upon the [§] 4A absentee voter classifications specified in the Constitution for general elections. It is our opinion, therefore, that, insofar as general elections are concerned, the classifications in [§] 5503(2) are unconstitutional limitations, and the classification in [§] 5503(3) is an unconstitutional enlargement, upon the 'business or occupation' classification of absentee voter in Del. Const. Art. 5, [§] 4A. The mandate of [§] 4A, that the 'General Assembly shall enact general laws' for absentee voting at general elections is not met by [§] 5503 insofar as the 'business or occupation' classification in [§] 4A is concerned.[83]

## I. Expansion of Absentee Voting via Constitutional Amendments

Over the next 50 years, the General Assembly adhered to the understanding—developed by the Delaware judiciary in *Lyons*, *Harrington*, and the 1972 *Opinion of the Justices*—that the General Assembly could only add absentee-voter

---

[83] *Id*. at 722–23. Section 5503(2) purported to grant absentee-voting privileges to persons "[in] the Armed Forces of the United States or the Merchant Marine of the United States, or attached to and serving with the Armed Forces of the United States in the American Red Cross, Society of Friends, or United Service Organizations . . . ."

classifications through the constitutional-amendment process. In 1977, the General

Assembly expanded Section 4A by amendment to allow voters on vacation to cast

absentee ballots.[84] Section 4A was enlarged again in 1983 with an amendment

allowing persons with qualifying religious reasons to vote absentee.[85] Then, in 1993,

the legislature passed another amendment expanding Section 4A, this time

permitting spouses and dependents of those in service of the state or of the United

States to participate in absentee voting.[86] In its current form, Section 4A provides

that:

> The General Assembly shall enact general laws providing that any qualified elector of this State, duly registered, who shall be unable to appear to cast his or her ballot at any general election at the regular polling place of the election district in which he or she is registered, either because of being in the public service of the United States or of this State, or his or her spouse or dependents when residing with or accompanying him or her because of the nature of his or her business or occupation, because of his or her sickness or physical disability, because of his or her absence from the district while on vacation, or because of the tenets or teachings of his or her religion, may cast a ballot at such general election to be counted in such election district.[87]

---

[84] 61 Del. Laws ch. 39, 52.

[85] 64 Del. Laws ch. 177, 444.

[86] 69 Del. Laws ch. 81, 174.

[87] DEL. CONST. art. V, § 4A. We have quoted the text of Section 4A as it is recorded in Volume 1 (2007 Replacement Volume) of the Delaware Code Annotated published by Michie™. One might reasonably suspect that the absence of a comma between the phrases "his or her spouse or dependents when residing with or accompanying him or her" and "because of the nature of his or her business" is a scrivener's error. Indeed, our review of the most recent amendment to Section 4A in 1991 and 1993 indicates that a comma was intended. *See* H.B. 298, 136th Gen. Assem. (Del. 1991) and H.B. 192, 137th Gen. Assem. (Del. 1993). In any event, the inclusion or omission of the comma has no bearing on our analysis here.

## J. The Pandemic and the First Vote-by-Mail Statute

In 2020, the General Assembly confronted the challenge of providing for an election that would, to the extent possible, protect voters and polling workers from the highly contagious COVID-19 virus. Authorizing voters who did not fall within the categories of citizens who, under Section 4A, were permitted to vote by absentee ballot to vote by mail appeared to be the answer. But Section 4A and the longstanding interpretation of it stood in the way.

The General Assembly found its way around this apparent obstacle through the exercise of its emergency powers, which are found in Article XVII, section 1 of the Constitution. Under Article XVII,

> [t]he General Assembly in order to insure continuity of State and local governmental operations in periods of emergency resulting from . . . disease . . . shall have the power and the immediate duty . . . to adopt such . . . measures as may be necessary and proper for insuring the continuity of governmental operations.

Of course, resort to the Article XVII emergency powers would be unnecessary if it were within the General Assembly's plenary authority to authorize by statute no-excuse voting by mail. Two critical findings and declarations in the 2020 Vote-by-Mail Statute, however, show that the General Assembly understood that it was constrained by Section 4A. In particular, the General Assembly found and declared that:

32

(11) Article V, §4A of the Delaware Constitution permits absentee voting in limited circumstances including when an elector is in the public service of the United States, the nature of an elector's business or occupation, or an elector's sickness, disability, or absence from the district while on vacation. *The list of reasons for absentee voting is exhaustive . . .*

(13) It is the judgment of the General Assembly that due to the highly contagious nature of COVID-19 and the need to protect the electors and polling workers in this State from infection of COVID-19, voting by mail is necessary and proper for insuring the continuity of governmental operations, *and to conform to the requirements of Article V, §4A, would be impracticable*.[88]

Grounded in these findings and declarations, the 2020 Vote-by-Mail bill passed both houses of the General Assembly with solid bipartisan support,[89] and the Governor promptly signed it into law. By its terms, though, the statute applied only to the elections occurring in 2020.

Despite this temporal limitation and the exigencies presented by the COVID-19 pandemic, the constitutionality of the 2020 Vote-by-Mail Statute was challenged. Like the case before us now, because the plaintiffs sought to enjoin the Department from implementing the statute, the challenge was filed in the Court of Chancery. According to the Vice Chancellor, the plaintiffs' objection to the 2020 statute under Article V, Section 4A of the Constitution was "uncomplicated"[90] and the issue to be

---

[88] H.B. 346, 150th Gen. Assem. (Del. 2020) (emphases added).
[89] H.B. 346 syn., 150th Gen. Assem. (Del. 2020), available at https://legis.delaware.gov/BillDetail?legislationId=48136.
[90] Republican State Comm. of Del. v. Dep't. of Elections, 250 A.3d 911, 918 (Del. Ch. 2020).

decided "straightforward,"[91] facilitated, in great part, by the parties' shared understanding of Section 4A. The court framed the issue in this way:

> *The parties agree that the list in Article V, § 4A of those citizens entitled to vote by absentee ballot is meant to be exhaustive.* Thus the General Assembly may only expand remote voting beyond that list by properly invoking the emergency powers of Article XVII, § 1 to "[e]nsure the continuity of State and local governments." In doing so, however, it must conform to the Delaware Constitution's requirements "except to the extent that[,] in the judgment of the General Assembly[,] to do so would be impracticable or would cause undue delay."[92]

Thus, the court's focus was on the propriety of the General Assembly's invocation of its emergency powers in service of an objective—no-excuse voting by mail—that the parties understood could not otherwise be achieved. In the end, the Court of Chancery determined that the General Assembly's determination that the 2020 Vote-by-Mail Statute was necessary to the continuity of governmental operations was not "clearly unreasonable or manifestly incorrect . . . ."[93] Hence, because the invocation of emergency powers under Article XVII is "a matter the Constitution explicitly commends to [] legislative discretion,"[94] the court did not block implementation of voting by mail in 2020, even though its enactment by statute was through an "otherwise extra-constitutional means."[95]

---

[91] *Id.* at 917.
[92] *Id.* (emphasis added).
[93] *Id.* at 921.
[94] *Id.* at 922.
[95] *Id.*

34

**K. The Failed Vote-by-Mail Amendment**

After the 2020 Vote-by-Mail Statute expired and in apparent recognition of the limiting nature of Section 4A, the 150th General Assembly (2019-2020) attempted to pass a constitutional amendment allowing for no-excuse voting by mail.[96] To accomplish this goal, the proposed amendment sought to replace the entirety of Section 4A with the following language: "The General Assembly shall enact general laws providing the circumstances, rules, and procedures by which registered voters may vote by absentee ballot."[97]

As mentioned above, the amendment of the Delaware Constitution is a two-step process, requiring a two-thirds majority vote in both houses of the General Assembly across two consecutive General Assemblies.[98] The "first leg" of the amendment was introduced as House Bill 73 on March 12, 2019.[99] Its original synopsis stated that the purpose of the amendment was to "eliminate from the Delaware Constitution the limitations as to when an individual may vote by absentee ballot."[100]

---

[96] H.B. 73, 150th Gen. Assem. (Del. 2020).
[97] *Id.*
[98] DEL. CONST. art. XVI, § 1.
[99] H.B. 73 syn., 150th Gen. Assem. (Del. 2020), available at https://legis.delaware.gov/BillDetail?legislationId=47181.
[100] *Id.*

The bill passed the House on April 11, 2019, with 38 votes in favor and 3 opposed.[101] The amendment was then transferred to the Senate where, on July 1, 2019, it initially failed to garner the necessary two-thirds majority vote, counting 11 senators in favor and 8 opposed.[102] The act was revived in the Senate on January 16, 2020, this time passing the chamber with 14 "yeses" and 5 "noes."[103]

After the amendment's "first leg" was approved by the 150th General Assembly, its "second leg" was introduced as House Bill 75 to the 151st General Assembly on January 14, 2021.[104] The House voted on the bill on June 10, 2021, and this time it was defeated with 14 representatives opposed and only 25 in favor.[105] The act was tabled in the House on June 17, 2021, effectively concluding the General Assembly's consideration of the amendment.[106] It never reached the Senate for a vote.[107]

Stymied by the proposed amendment's failure in the House, the legislative proponents of the expansion of no-excuse voting by mail reverted—albeit with a

---

[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] H.B. 75 syn., 151st Gen. Assem. (Del. 2021), available at https://legis.delaware.gov/BillDetail?legislationId=48291.
[105] *Id.*
[106] *Id.*
[107] *Id.*

measure of diffidence[108]—to the ordinary legislative process.  We turn next—and at long last—to the resulting statutes, which are the subject of the current constitutional challenges.[109]

## L.  The Challenged Statutes

### i.    Same-Day Registration Statute

As mentioned earlier, Sections 2036 and 2047 of Title 15 previously required that voters be registered "by the fourth Saturday prior to the date of a primary or general election, or by 10 days prior to a special election, in order to vote in that election."[110]  The Same-Day Registration Statute would allow Delaware voters to register to vote on election day.

Under the new statute, same-day registrations would be handled at polling location "help desk[s]."[111]  Any issues regarding the registration or eligibility of voters would be referred to the Department staff from the county offices.[112]  The

---

[108] Contemporaneous comments by members of the General Assembly suggested that the legislature anticipated legal challenges to the new law.  For example, the primary sponsor of the Vote-by-Mail Statute in the Senate proclaimed that if "we have exceeded our powers, the Supreme Court will tell us so."[108]   The Speaker of the House asserted, "I don't know whether it's constitutional or not constitutional, and neither do you guys or anybody else in here.  The best way to get this thing done is to hear this bill, move forward, and let a challenge go to the courts and let them decide it."  *Higgin*, 2022 WL 4239590, at *5.

[109] *Id.*

[110] Defs.' Opening Br. in Supp. of Defs.' Mot. for Summ. J. and Answering Br. in Opp'n to Pls.' Mot. for Summ. J. at 10, *Higgin v. Albence*, C.A. No. 2022-0641, Dkt. 28.

[111] *Id.*

[112] *Id.*

37

Department would maintain an electronic poll list available by request to each election candidate and update it in as close to real-time as possible.[113] According to Commissioner Albence, no election officers would be involved in handling problems with registration or eligibility.[114]

### ii. Vote-by-Mail Statute

The Vote-by-Mail Statute contained only one meaningful difference from the 2020 Vote-by-Mail Statute: where the 2020 version contemplated the automatic delivery of an application to vote by mail to all voters, the 2022 version would require the voter to request an application for a mail-in ballot.[115] The voter would not be required to offer a reason why she could not vote in person. A requested ballot would then be mailed to qualified voters "who must confirm and provide required identification information, seal the ballot envelope, sign the voter oath on the envelope, place a provided security label over the identification information, and either mail the ballot to the Department or place it in a secure drop-box at a county election office."[116] The Department would process and scan ballots when they were received, but they were not permitted to count ballots until election day.[117]

---

[113] *Higgin*, 2022 WL 4239590, at *5.
[114] *Id*.
[115]*Id*. at *5 (citing Summ. J. Arg. Tr. at 99:3–100:3), *Higgin v. Albence*, C.A. No. 2022-0641, Dkt. 36).
[116] *Id.* at *6.
[117] *Id.*

Completed ballots were to remain in a secure location until they were ready to be tabulated.[118] According to Commissioner Albence, no election officers would be involved in the opening, processing, or tabulating of any of the mail-in ballots.[119]

## II. PROCEEDINGS IN THE COURT OF CHANCERY

On the day—July 22, 2022—the Governor signed the two statutes into law, Michael Higgin and Michael Mennella filed their complaint in the Court of Chancery, seeking a declaration that the Vote-by-Mail Statute and the Same-Day Registration Statute violated the Delaware Constitution and an injunction prohibiting their implementation. At the time, Higgin was a resident of Bear, Delaware, a registered voter and "a filed-candidate for State Representative in District 15 for the November 8, 2022 General Election."[120] Mennella was a resident of Newark, Delaware, a registered voter, and a past inspector of elections who hoped to serve in that role "at the 2022 Primary and General Elections and at other future elections."[121]

That same day, Ayonne "Nick" Miles, Paul J. Falkowski, and Nancy M. Smith filed their complaint, seeking similar relief but only as to the Vote-by-Mail Statute.

---

[118] Defs.' Opening Br. in Supp. of Defs.' Mot. for Summ. J. and Answering Br. in Opp'n to Pls.' Mot. for Summ. J. at 10, *Higgin v. Albence*, C.A. No. 2022-0641, Dkt. 28.
[119] *Id.*
[120] App. to Opening Br. at A21.
[121] *Id.*

These Plaintiffs were, when their complaint was filed, Delaware residents—each from different counties—and registered voters.

Because the Department was planning to mail ballots to potential voters in early October the parties and the Court of Chancery agreed to an expedited litigation schedule. After expedited briefing on the parties' cross-motions for summary judgment, the court entertained oral argument on August 31, 2022, and issued its Memorandum Opinion two weeks later.

In a thoughtful and lucidly written opinion, after rejecting in part and sidestepping in part the Department's claim that all the Plaintiffs lacked standing to challenge the statute, the Vice Chancellor found that he was "compelled by precedent to conclude that the Vote-by-Mail Statute's attempt to expand absentee voting to the Delawareans who do not align with any of Section 4A's categories must be rejected."[122] The court did not feel so constrained, however, in its review of the Same-Day Registration Statute. It viewed Article V, Section 4's provision that there must be "at least" two registration days within a specified time-period as "establish[ing] a constitutional floor, not a ceiling."[123] In other words, the court concluded that Section 4's registration window within which there must be at least

---

[122] *Higgin*, 2022 WL 4239590, at *2.
[123] *Id*. at *1.

40

two registration days established a "constitutional minimum." In consequence, the legislative authorization of registration outside the window—even up to the closing of the polls[124] on election day—did not, the court decided, run afoul of Section 4.

The parties cross-appealed, the Department arguing that the Court of Chancery erred in its determination that the Plaintiffs had standing to challenge the statutes and that the Vote-by-Mail Statute was unconstitutional, and the Plaintiffs contesting the court's ruling that the Same-Day Registration Statute passed muster.

### III.   ISSUES RAISED ON APPEAL

The issues before us on appeal mirror those raised by the parties in the Court of Chancery. The Department leads off with its contention that none of the Plaintiffs has standing to challenge either of the statutes. But, the Department argues, even if they did, the Court of Chancery erred when it struck down the Vote-by-Mail Statute. Relying heavily on the presumption that duly enacted legislation is constitutional and the absence in the Constitution of an express prohibition against voting by mail, the Department urges us to disregard Delaware precedent that casts doubt on the validity of the Vote-by-Mail Statute. Instead, we should, according to the

---

[124] Under 15 *Del. C.* § 4947, "[t]he election shall be continued open until 8:00 p.m. when it shall be closed." Voters who are present and prepared to vote but waiting in a line at 8:00 p.m. are nevertheless permitted to vote.

Department, follow the approach adopted by courts in Pennsylvania and Massachusetts and revive the Vote-by-Mail Statute.

Not surprisingly, the Plaintiffs defend the Court of Chancery's rejection of the Vote-by-Mail Statue, which they claim "is in direct contravention of"[125] Article V, Sections 1 and 4 of the Delaware Constitution. The Plaintiffs contest, however, the Court of Chancery's upholding of the Same-Day Registration Statute, which was based, they claim, on an "interpretation [that] is contrary to the constitution's text and intention, as well as precedent."[126]

## IV.  ANALYSIS

We review the Court of Chancery's granting of summary judgment *de novo*.[127] Likewise, questions of law, including standing[128] and constitutional claims[129] are reviewed *de novo.*

### A.  Standing

"Standing" refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance.[130] "Standing is a threshold question that must

---

[125] Answering Br. at 6.
[126] *Id*. at 40.
[127] *Cerberus Int'l, Ltd. v. Apollo Mgmt.*, L.P., 794 A.2d 1141, 1153 (Del. 2002).
[128] *Rosenbloom v. Esso Virgin Islands, Inc*., 766 A.2d 451, 458 (Del. 2000).
[129] *Doe v. Wilm. Hous. Auth.*, 88 A.3d 654, 661 (2014).
[130] *Dover Hist. Soc'y. v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003) (citing *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991)).

be answered by a court affirmatively to ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers."[131]  The issue of standing is concerned "only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy."[132]  "The party invoking the jurisdiction of a court bears the burden of establishing the elements of standing."[133]

In the absence of a specific statutory grant of review, to establish standing in Delaware, "a plaintiff or petitioner must demonstrate first, that he or she sustained an 'injury-in-fact'; and second, that the interests he or she seeks to be protected are within the zone of interests to be protected."[134]  Delaware's standards for determining standing are generally the same as the requirements for establishing Article III standing in federal court.[135]  Unlike the federal courts, however, where standing may be subject to stated constitutional limits, we "apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are 'mere intermeddlers.'"[136]

---

[131] *Riverfront Hotel LLC v. Bd. of Adjustment of City of Wilm.*, 213 A.3d 89, 2019 WL 3884031, at *1 (citing *Dover Hist. Soc'y*, 838 A.2d at 1111).
[132] *Stuart Kingston*, 596 A.2d at 1382 (emphasis in original).
[133] *Dover Hist. Soc'y*, 838 A.2d at 1110.
[134] *Id*.
[135] *Dover Hist. Soc'y*, 838 A.2d at 1111 (citing *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 904 (Del. 1994)).
[136] *Id.* at 1111 (citing *Stuart Kingston*, 596 A.2d at 1382) (cleaned up).

Generally, this means that "a plaintiff must demonstrate that: (i) the plaintiff has suffered an 'injury-in-fact,' i.e., a concrete and actual invasion of a legally protected interest; (ii) there is a causal connection between the injury and the conduct complained of; and (iii) it is likely the injury will be redressed by a favorable court decision."[137]  In addition, the plaintiff must demonstrate that the interest they seek to vindicate is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."[138]  Although we refer to the federal courts' interpretation of Article III standing, Delaware courts are not bound by the federal rules of justiciability.[139]  That is because the authority of our courts is derived from the plenary and unenumerated powers of state sovereignty.[140]  Federal courts, on the other hand, "can only exercise the sovereign power that the states delegated to the United States as a limited government with enumerated powers."[141]

---

[137] *Reeder v. Wagner*, 974 A.2d 858, 2009 WL 1525945 (Del. June 2, 2009) (TABLE) (citing *Dover Hist. Soc'y*, 838 A.2d at 1110).
[138] *Gannett Co., Inc. v. State*, 565 A.2d 895, 897 (Del. 1989); *Oceanport Indus.*, 636 A.2d at 904 ("A party who is required to show an injury in fact, and that such injury is within the zone of interests sought to be protected by the statute, clearly comes within the purview of these statutes."); *Riverfront Hotel LLC*, 2019 WL 3884031, at *1.
[139] *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) ("We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability[.]").
[140] *Murphy v. Nat'l Collegiate Athletic Ass'n*, --- U.S. ----, 138 S. Ct. 1461, 1475–77, 200 L.Ed.2d 854 (2018).
[141] *In re Del. Pub. Schs. Litig.*, 239 A.3d 451, 510 (Del. Ch. 2020) (citing *Murphy*, 138 S. Ct. at 1475–77).

Consequently, Delaware's courts may hear cases and controversies that the federal courts cannot.[142]

Because Higgin has challenged the constitutionality of the Vote-by-Mail Statute and the Same-Day Registration Statute, if he has standing as to both challenges, we need not pass upon the standing of the other Plaintiffs. Therefore, we first attend to Higgin's status as a candidate on the 2022 ballot at the time of his challenge. The uncontested facts show that Higgin was a candidate for State Representative in District 15 of Delaware in the 2022 election.[143] As a candidate for state office in Delaware, Higgin was actively campaigning, fundraising, meeting with voters, and distributing campaign literature daily.[144]

Higgin claims that the Vote-by-Mail Statute is unconstitutional and that "the mail-in-voting process requires a candidate to waste valuable time and resources on campaigning to people who may have already voted through mail-in voting."[145] He argues, moreover, that he "is entitled to a fair election, guaranteed by the Delaware Constitution, and votes made and tabulated in violation of the Delaware Constitution

---

[142] *See Reeder*, 2009 WL 1525945, at *2 ("Even absent the showing of a particularized injury . . . this Court has recognized in certain cases that a plaintiff may have standing, as a taxpayer, to enjoin the unlawful expenditure of public money or the misuse of public property.").
[143] Higgin Aff. ¶3-4, *Higgin v. Albence*, C.A. No. 2022-0641, Dkt. 24.
[144] *Id*. at ¶ 6.
[145] Answering Br. at 18.

are unlawful on their face."[146]  Higgin argues further  that "a fair election" is an election conducted in accordance with the Delaware Constitution[147] and that the Same-Day Registration Statute would "deprive him of the opportunity to utilize the full amount of time before the election to reach out to as many voters as possible until election day."[148]  We agree with the Court of Chancery that Higgin's concerns go beyond a claim of voting dilution.[149]  They "strike at the voting right itself" and the tenet that "only votes legally made—count."[150]

It seems nearly self-evident that a candidate who runs the risk of defeat because of the casting of ballots that are the product of an extra-constitutional statute has standing to challenge that statute.  And, for standing purposes, it matters little whether the ballots are unlawful because they are constitutionally unauthorized absentee ballots or because they are cast by unlawfully registered voters.  Simply put, the casting and counting of legally invalid ballots would necessarily lead to an inaccurate vote tally, which, as the United States Court of Appeals for the Eighth Circuit has recognized, is a concrete and particularized injury to candidates

---

[146] Verified Compl. ¶7, App. to Opening Br. at A20.
[147] Oral Arg. on Cross-Motions for Summ. J., App. to Opening Br. at A470.
[148] Verified Compl. ¶7, App. to Opening Br. at A20.
[149] *Higgin*, 2022 WL 4239590, at *12 ("Regardless of how laudable the purpose behind the Vote-by-Mail Statute may be, the statute cannot introduce into the General Election votes prohibited under the Delaware Constitution.").
[150] *Id.*

participating in the affected election.[151] It is equally plain to us that Higgin's interest in an election that comports with Article V of the Delaware Constitution is squarely within the zone of interests Article V is designed to protect and regulate.

This conclusion, in our view, is consistent with the United States Supreme Court's standing analysis in *Lujan v. Defenders of Wildlife*.[152] In *Lujan*, Justice Scalia observed that "[w]hen . . . the plaintiff is himself an object of the action (or forgone action) at issue . . . there is ordinarily little question" that he has standing.[153] To be sure, a fair point could be made that the direct objects of the Vote-by-Mail Statute and Same-Day Registration Statute are the electors and registrants, and not the candidates for whom they might vote.[154] But to ignore that the ultimate objects of our elections are the elected, as well as the defeated, would be to turn a blind eye to the reality that those most immediately affected—and harmed by an inaccurate vote count—are those running for office.[155]

---

[151] *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020) (holding that "[a]n inaccurate vote tally is a concrete particularized injury to candidates" who were nominees to be electors for the State of Minnesota in the 2020 presidential election and, as such, treated as "candidates" under Minnesota law). *See also Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020) (concluding that then-President Trump alleged "'concrete and particularized' harm stemming from the allegedly unlawful manner by which Wisconsin appointed its electors.").

[152] 504 U.S. 555 (1992).

[153] *Id*. at 561.

[154] *Cf. Michel v. Anderson*, 14 F.3d 623, 626 (D.C. Cir. 1994) ("It could not be argued seriously that voters would not have an injury if their congressman was not permitted to vote at all on the House floor.").

[155] *See Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d. 19, 35 (S.D.N.Y. 2020) ("Candidates have an interest not only in winning or losing their elections, but also in ensuring

Here, the facts surrounding the relationship of Higgin's candidacy and the imminent injury[156] it would have suffered on election day had the challenged statutes been left unchecked are sufficient to satisfy our standing requirements.[157]

## B. Relevant Interpretative Principles

Our analysis of the constitutional claims advanced by Higgin is informed by certain well-settled interpretative principles. We begin with the fundamental precept that, as the Court of Chancery correctly observed, "[e]nactments of the Delaware General Assembly are presumed to be constitutional."[158] "This is because of the familiar principle which is nowhere questioned, that in the American States, as distinguished from the Federal Government, the legislative power is as broad and ample in its omnipotence as sovereignty itself, except in so far as it may be curtailed by constitutional restrictions express or necessarily implied."[159]

One who seeks to invalidate a statute on constitutional grounds "has the burden of rebutting this presumption of validity and constitutionality which

---

that the final vote tally accurately reflects the votes cast."). *See also ASARCO Inc.*, 490 U.S. at 616 (the basic inquiry for Article III standing is whether the party "alleges personal injury that is fairly traceable to the challenged conduct and likely to be redressed by the requested relief.").

[156] *But see Lujan*, 504 U.S. at 564 n.2 ("Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond the breaking point . . .").

[157] This conclusion is dependent upon Higgin's status as an active candidate in the affected election and renders consideration of his and the remaining Plaintiffs' other standing arguments based on their status as registered voters unnecessary.

[158] *Hoover v. State*, 958 A.2d 816, 821 (Del. 2008), *quoted in Higgin*, 2022 WL 4239590, at *15.

[159] *Collison v. State ex rel. Green*, 2 A.2d 97, 100 (Del. 1938).

accompanies every statute."[160] Constitutional prohibitions to legislative action must be shown by "clear and convincing evidence."[161] As the Court of Chancery noted, when evaluating the constitutionality of a challenged statute, the court shows "deference to legislative judgment in matters 'fairly debatable.'"[162] Consequently, "[a]ll reasonable doubts as to the validity of a law must be resolved in favor of the constitutionality of the legislation."[163]

But when such a construction discerns a conflict between the Constitution and a statute, the Constitution will prevail.[164] Indeed, the foundation upon which our constitutional jurisprudence is built is the principle that "the constitution controls any legislative act repugnant to it."[165] It follows that "an act of the legislature repugnant to the constitution is void."[166]

---

[160] *McDade v. State*, 693 A.2d 1062, 1065 (Del. 1997).

[161] *Sierra v. Dep't of Servs. for Children, Youth & their Families*, 238 A.3d 142, 156 (Del. 2020).

[162] *Helman v. State*, 784 A.2d 1058, 1068 (Del. 2001), *quoted in Higgin*, 2022 WL 4239590, at *15.

[163] *Hoover*, 958 A.2d at 821 (quoting *McDade*, 693 A.2d at 1065). The Court of Chancery classified these principles as falling within "the doctrine of constitutional avoidance." *Higgin*, 2022 WL 4239590, at *17. That "doctrine," which is more aptly described as the "avoidance canon," cautions courts to avoid, when possible, the interpretation of a statute that would render the statute unconstitutional or that would raise serious constitutional difficulties. *See* WILLIAM N. ESKRIDGE, JR., INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 425 (2016). As we see it, that canon has no work to do in this case. Neither the Court of Chancery nor this Court has been asked to interpret either of the challenged statutes as there is no dispute as to their meaning.

[164] *Evans v. State*, 872 A.2d 539, 553 (Del. 2005).

[165] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), *quoted in Evans*, 872 A.2d at 553.

[166] *Id.*

## C.  Vote-by-Mail Statute

The Department's defense of the Vote-by-Mail Statute leads with the contention that voting by mail is fundamentally different than absentee voting, which is the express subject matter of Article V, Section 4A of the Delaware Constitution. It follows, argues the Department, that "the Court's analysis need not reach Section 4A at all."[167]  But, according to the Department, even if we were to consult Section 4A, because it does not expressly prohibit voting by mail without an excuse— that is, it does not explicitly state that the categories of eligible absentee voters are exhaustive—only an implied restriction will suffice to defeat the Vote-by-Mail Statute.  And the Court of Chancery's "reluctant[]" finding of an implied prohibition "in the limited decades-old (and readily distinguishable) Delaware case law addressing absentee voting and mail-in voting"[168] is, the Department says, contrary to "modern judicial pronouncements counseling against engrafting an unstated implied limitation."[169]  The Department's preferred approach is embodied, not in the Delaware precedents and not in the apparently long held understanding of the General Assembly, but in the reasoning of the high courts of Pennsylvania and Massachusetts.

---

[167] Opening Br. at 21.
[168] *Id*. at 22.
[169] *Id*. at 23.

50

We reject the Department's claim that Section 4A's absentee-voting provisions are not implicated in the proper analysis of the Vote-by-Mail Statute. We cannot, moreover, ignore the historical context in which our constitutional absentee-voting provisions were adopted and the settled understanding of them as expressed by all three branches of our state government in favor of the approach by other states whose historical experience differs from ours. Consequently, we reaffirm that our Constitution impliedly excludes voting by mail by electors who do not fall within one of the categories set forth in Section 4A.

(i) Applicability of Section 4A

The Department's contention that "mail-in voting is not absentee voting" is grounded in the notion that "Section 4A contemplates absentee voting as predicated on a voter's *inability* to appear in-person to vote" while "the Vote-by-Mail Statute allows all registered voters to apply and submit a mail-in ballot, and they need not identify a reason." Thus, the Department argues, "[t]here is no constitutional prohibition on the General Assembly's ability to authorize voting by mail, and the General Assembly is free to legislate as it deems fit."[170]

As the Court of Chancery observed, the Department offers no authority for distinguishing voting by mail from absentee voting. It bears noting here that, when

---

[170] *Id.* at 21.

the General Assembly passed the 2020 Vote-by-Mail bill under its emergency powers, it explicitly linked that temporary measure to its inability to legislate around Section 4A's absentee-voting provisions. Along these same lines, when the Department defended the 2020 statute's constitutionality in the Court of Chancery, it candidly acknowledged the relevance of Section 4A's absentee-voting provisions and the similarity of the 2020 statute and the absentee-voting statute codified at 15 *Del. C.* ch. 55.[171] Given that, it is not surprising that the Court of Chancery then described the 2020 Vote-by-Mail Statute as authorizing "general absentee voting."[172]

Nor is it surprising to us that two years later the Court of Chancery would conclude that the Department's distinction between voting by mail and absentee voting is "contradicted by Delaware law and, frankly, common usage."[173] We concur in that assessment.

Both the Vote-by-Mail Statute and Section 4A address the authorization of voting without appearing at a regular polling place while the Vote-by-Mail Statute expands that authorization to include electors who merely choose not to appear. This

---

[171] Defs.' Corrected Answering Br. in Opp'n to Pls.' Mot. for Summ. J. at 9, *Republican State Comm. of Del. v. Dep't of Elections,* C.A. No. 2020-0685, Dkt. 25.

[172] *Republican State Comm.*, 250 A.2d at 918. In this case, the Court of Chancery noted that the court's 2020 opinion "consistently used the terms interchangeably." *Higgin*, 2022 WL 4239590, at *23.

[173] *Higgin*, 2022 WL 4239590, at *23.

does not create an essential difference in the underlying subject matter of the constitutional provision and the statute, which is the scope of eligibility for remote voting. The statute purports to expand that scope by adding a new—and admittedly all-encompassing category: voters who choose to vote absentee. It is no small coincidence that, when the General Assembly recently attempted to adopt an amendment that would allow what the Department now attempts to distinguish as "Mail-in Voting" it did so by proposing that Section 4A's absentee-voting provisions be amended. The proposed amendment speaks for itself: "The General Assembly shall enact general laws providing the circumstances, rules, and procedures by which registered voters may vote by *absentee ballot*."[174] Now calling what appears to be general or universal absentee voting by another name will not insulate the statute from review under Section 4A.

As previously discussed in this opinion, each rendition of this state's constitution, culminating in the still operative 1897 Constitution, has envisioned that electors will vote in-person at their regular polling place. In fact, it is precisely because our Constitution "contemplates and requires the personal attendance of the voter at the polls," that the Court of General Sessions struck down the 1923 absentee voting law in *State v. Lyons*, concluding that "the statutory authority for voters to

---

[174] *See* H.B. 73, 150th Gen. Assem. (Del. 2020) (emphasis added).

53

cast their ballots *by mail* is unconstitutional under the present provisions of the Constitution."[175]  Importantly, the invalid law allowed voters who "may be absent"—for specific reasons—on election day to "mail[] . . . or . . . [to] deliver in person" prepaid ballots to their local polling place.[176]

Four years later, in *State ex rel. Walker v. Harrington*, this Court affirmed the *Lyons* court's conclusion that absentee voting was repugnant to the Constitution. As previously discussed, *Harrington* involved a challenge to the Soldiers' Vote Act, which allowed soldiers to vote away from their regular polling place by permitting them to vote in-person at their place of encampment.[177]  The *Harrington* court struck down the law because, according to the opinion, not only did the Constitution require that votes be cast in-person—which the Soldiers' Vote Act technically provided for by erecting a polling place at the soldiers' camp—it also "require[d] the polling places for the reception of ballots at general elections . . . to be located within the territorial limits of the State."[178]  Taken together, *Lyons* and *Harrington* made clear that our Constitution prohibited voting away from one's local polling place— regardless of what form such voting took.

---

[175] *Lyons*, 5 A.2d at 503 (emphasis added).
[176] 33 Del. Laws ch. 33, 258–60.
[177] *Harrington*, 30 A.2d at 690.
[178] *Id.* at 693.

The addition of Section 4A to the Delaware Constitution in 1943—an apparent response to *Lyons* and *Harrington*[179]—created, for the first time, a constitutional exception to the general rule requiring that all votes be cast in-person at a voter's local polling place, expressly identifying specific categories of voters who would be permitted to vote absentee. Because it is the only provision in our Constitution concerning absentee voting, and because we consider mail-in voting to be a form of absentee voting—it is voting away from one's regular polling place— the validity of the Vote-by-Mail Statute, which expands the categories of voters allowed to vote absentee, is properly assessed with reference to Section 4A.

(ii) The Opinion of the Justices (1972)

The Department next argues that, even if voting by mail is equivalent to absentee voting, the Vote-by-Mail Statute is nevertheless constitutional because, "although the plain text of Section 4A requires the General Assembly to provide for absentee voting for voters in [] specific categories, nothing in Section 4A prevents the General Assembly from enacting absentee voting for additional categories of voters."[180] In other words, the General Assembly is free to extend the right to vote

---

[179] The Court of Chancery accurately noted that *Harrington* was decided between the first and second legs of the amendment adopting Section 4A. *Higgin*, 2022 WL 4239590, at *26 n.217. From this, the court speculated that the *Harrington* decision might have been "eased significantly by the anticipated second leg . . . ." *Id.* We, however, do not see the timing of *Harrington* vis-à-vis the ultimate passage of the amendment as relevant to the opinion's constitutional analysis.
[180] Opening Br. at 22.

absentee to all voters because Section 4A, by its own terms, does not purport to be an exhaustive list; for the Department, it "establishes a constitutional floor," rather than "a ceiling."[181] We disagree. The overwhelming weight of our history, as evidenced by the opinions and actions of generations of legislators, election officials, and judges, compels the conclusion that the categories of voters identified in Section 4A constitute a comprehensive list of eligible absentee voters. In consequence, the legislature is impliedly prohibited from either abridging or enlarging those categories except by constitutional amendment.

We will not rehearse that history in full here: a summary, at the risk of repetition, of our prior historical discussion should suffice. In the more than two centuries preceding the adoption of Section 4A, all voting occurred in person and at regular polling places. In the year of Section 4A's adoption—in fact less than two months before[182]—this Court remarked that "the drafters of the Constitution intended that electors, when offering to vote must personally appear at polling places within the limits of the State . . . ."[183] This, of course, followed close on the heels of the Court of General Sessions' pronouncement four years earlier that the General

---

[181] *Id.*

[182] The *Harrington* opinion was issued on February 22, 1943. *See Harrington*, 30 A.2d at 688. It appears that the approval of Section 4A was communicated to the executive on April 9, 1943. *See* H.B. 5, 109th Gen. Assem. (Del. 1943).

[183] *Harrington*, 30 A.2d at 692.

Assembly was powerless to provide for absentee voting by statute.[184]  In the midst

of this constitutional skirmish, the General Assembly initiated the amendment

process that led to the adoption of Section 4A.[185]  Rather than allowing for expansive

absentee voting, the amendment carefully limited eligibility to electors who were

"unable to appear to cast his or her ballot at any general election at the regular polling

place of the election district in which he or she is registered, either because of being

in the public service of the United States or this State, or because of the nature of his

or her business or occupation, or because of his or her sickness or physical disability

. . . ."[186]

For the next 29 years, as best we can tell, absentee voting was strictly limited

to public servants, disabled voters, and certain persons in the work force, on the

condition that they were unable to appear in person at their polling places.  In 1972,

in response to questions propounded by the Governor regarding the then-current

absentee voting statute, which, as noted earlier, expanded absentee-voting eligibility

to qualified electors who were "unavoidably absent" on the day of the election, each

of the three Justices then composing the entirety of this Court opined that:

---

[184] *Lyons*, 5 A.2d at 503.
[185] The amendment cleared the first leg of the amendment process in the 108th Session of the General Assembly in 1941 and the second leg in the 109th Session of the General Assembly in 1943.  *See* 43 Del. Laws ch. 1, 3 (documenting "first leg") and 44 Del. Laws ch. 1, 3 (documenting "second leg").
[186] 44 Del. Laws ch. 1, 3.

Del. Const. Art. 5, [§] 4A specifically enumerates the classifications of persons eligible to vote by absentee ballot at general elections. *We are of the opinion that by expressly including certain classifications, the drafters of [§] 4A impliedly excluded all other classifications. It is beyond the power of the Legislature, in our opinion, to either limit or enlarge upon the [§] 4A absentee voter classifications specified in the Constitution for general elections.* It is our opinion, therefore, that insofar as general elections are concerned, the classifications in [§] 5503(2) are unconstitutional limitations, and the classification in [§] 5503(3) is an unconstitutional enlargement, upon the 'business or occupation' classification of absentee voter in Del. Const. Art. 5, [§] 4A.[187]

This opinion, we admit, does not have binding precedential effect.[188] Yet the 1972 *Opinion of the Justices* has been treated, over the last fifty years and until this litigation, as the well-settled interpretation of Section 4A. Each time the General Assembly sought to expand the categories of voters entitled to vote absentee, they attempted to do so by means of constitutional amendment—successfully in 1977, 1983, and 1993. In 2020, the General Assembly explicitly found—in an effort to

---

[187] *Opinion of the Justices*, 295 A.2d at 722 (emphasis added).

[188] *See* HOLLAND, *supra* note 8, at 181 ("Since the nature of this advisory function is nonjudicial, it does not constitute an adjudication by the Supreme Court. Accordingly, advisory opinions by the individual justices do not have a binding precedential effect."). *See also State v. Highfield*, 152 A. 45, 52 (Del. 1930) ("The relator very largely bases his contention on an advisory opinion involving a similar question given by the then Chancellor and Law Judges, to the Governor, in 1910. While that opinion was contrary both to our conclusion and to that of the majority of the court below in this case, the facts would seem to indicate that the Judges who gave it did not have the benefit of the argument of counsel or the citation of authorities on the question before them, and that the rights of the parties were, therefore, not fully presented to them. Further than that, as was pointed out by the court below, opinions of that character, in this State, are usually not reported and are not considered to have the binding effect of a judgment regularly entered in a court proceeding.")

authorize universal absentee voting ahead of the 2020 election through the legislature's emergency powers—that "[t]he list of reasons for absentee voting [contained in Article V, § 4A] is *exhaustive*."[189]  And in defending against challenges to the 2020 Vote-by-Mail act in the Court of Chancery, lawyers for the Department "concede[d] that the Delaware Constitution lists reasons for which ballots may be provided for absentee voting [and] that this list of reasons is intended to be comprehensive."[190]

The General Assembly continued to adhere to this traditional understanding of Section 4A even after the expiration of the 2020 act, attempting to pass, in 2021, the "second leg" of an amendment to create a constitutional right to universal absentee voting.  Only when this amendment failed did the General Assembly decide to avoid  fifty years of precedent and expand Section 4A via statute—a strategy that the Department now defends despite its previous statements to the Court of Chancery in 2020.  Rather than accept the Department's change of position, we review our history through a widened lens and affirm that Section 4A's categories are exhaustive.

---

[189] H.B. 346, 150th Gen. Assem. (Del. 2020) (emphasis added).
[190] *Republican State Comm.*, 250 A.3d at 913.

But it is not history alone that persuades us that the Vote-by-Mail Statute violates Section 4A. Our construction of Section 4A also comports with two time-honored principles of interpretation. Under the linguistic canon known as "*expressio* (or *inclusio*) *unius*," the expression of one thing—here the categories of absentee voters provided in Section 4A—suggests the exclusion of others.[191] Of course, this canon "must be applied with great caution, since its application depends so much on context[] . . . ."[192] Here, however, the context of Section 4A's enactment and amendment as described above weighs heavily in favor of its application. Thus, Section 4A's enumeration of absentee-voter classifications suggests the exclusion of additional classifications.

The Vote-by-Mail Statute also creates a surplusage problem. As the Court of Chancery aptly observed, "if both Section 4A and the Vote-By-Mail Statute enable citizens to vote without appearing in-person, and the Vote-By-Mail Statute is unlimited as to such eligibility, then the Vote-By-Mail statute necessarily would paint over the specific categories of eligible citizens enumerated in Section 4A."[193] Put another way, if electors are permitted to vote without appearing at their regular polling places, Section 4A's categories become superfluous, and the possibility that

---

[191] *See* ESKRIDGE, *supra* note 163, at 408.
[192] ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012).
[193] *Higgin*, 2022 WL 4239590, at *24.

a future General Assembly might someday repeal the Vote-by-Mail Statute thereby reviving Section 4A is an insufficient reason for ignoring this problem.[194]

For all these reasons, we stand by our predecessors' conclusion that the General Assembly is constitutionally prohibited from enlarging upon Section 4A's absentee-voter classifications.

(iii) Decisions from Sister States

In reaching our decision, we have considered, and have declined to follow opinions—one by the Supreme Court of Pennsylvania[195] and the other from the Supreme Judicial Court of Massachusetts[196]—both of which reached a different conclusion than ours under similar circumstances. In diverging from the approach taken in Pennsylvania and Massachusetts, we do not insinuate a failure of wisdom or analysis on the part of our learned counterparts in those states; indeed, had our historical record and constitutional tradition not pointed us firmly in the direction we have taken, we might very well have followed their lead. In the end, however,

---

[194] According to the Court of Chancery, the Department had identified a "straightforward and compelling harmonization of the Vote-by-Mail Statute and Article V, Section 4A. . . " predicated on the notion that statutes are not necessarily permanent. *Higgin*, 2022 WL 4239590, at *28 n.221. A future General Assembly, the Department notes, might choose to repeal the Vote-by-Mail Statute in which case Section 4A would no longer be superfluous. We are not inclined to base our analysis on this contingency.

[195] *McLinko v. Dep't of State*, 279 A.3d 539 (Pa. 2022).

[196] *Lyons v. Sec'y of Commonwealth*, 192 N.E.3d 1078 (Mass. 2022).

we are satisfied with the guidance provided by our own history as reflected in our case law and its longstanding acceptance by our political branches.

### D. Same-Day Registration Statute

We turn next to Higgin's claim that the Same-Day Registration Statute conflicts with Article V, Section 4's requirement that voter registration occur within a specified window of time—"not more than one-hundred and twenty days nor less than sixty days before and be completed not more than twenty nor less than ten days before such election."[197]  If this requirement sets strict temporal boundaries around voter registration, then allowing voters to register as contemplated by the Same-Day Registration Statute through the day of the election is outside constitutional bounds.

The Court of Chancery rejected Higgin's reading of Section 4.  In the court's eyes, Section 4's stipulation that there should be "at least two registration days" within the specified time period results in "[a] plain-language reading of Section 4 [that] suggests that it provides for a *minimum* period of registration, and the Same-Day Registration Statute['s] providing for additional days would not disturb that constitutionally[]protected minimum."[198]

---

[197] DEL. CONST. art. V, § 4.
[198] *Higgin*, 2022 WL 4239590, at *16 (emphasis in original).

The Court of Chancery also pointed to the 1925 amendment of Section 4, discussed earlier, as a "very significant change to the text of Article V, Section 4" that not only supported the court's plain-meaning analysis, "but also independently compel[led] the conclusion that the Higgin Plaintiffs have failed to show clear evidence that the Same-Day Registration Statute violates the Delaware Constitution."[199] Of particular interest to the court was the deletion of the words "to be completed" from Section 4's delineation of the registration window.

We disagree with the Court of Chancery's conclusion. The court's interpretation of Section 4, in our view, does not take sufficient account of the appeal and correction procedures that are part of the constitutionally mandated registration process. Moreover, it places undue emphasis on a non-substantive, and partially semantic revision of Section 4 in the 1925 amendment. In our view, the Same-Day Registration Statute cannot be reconciled with Section 4 and is therefore void.

As mentioned earlier, Section 4 envisions both an appeal process and a correction process. The appeal process is described in the fourth paragraph of Section 4:

> From the decision of the registration officers granting or refusing registration, or striking or refusing to strike a name or names from the registration list, any person interested, or any registration officer, may appeal to the resident Associate Judge of the County, or in case of his

---

[199] *Id.* at *18.

63

or her disability or absence from the County, to any Judge entitled to sit in the Supreme Court, whose determination shall be final; and he or she shall have power to order any name improperly omitted from the said registry to be placed thereon, and any name improperly appearing on the said registry to be stricken therefrom, and any name appearing on the said registry, in any manner incorrect, to be corrected, and to make and enforce all necessary orders in the premises for the correction of the said registry.[200]

In recognition of the importance of this appeal right, the General Assembly enacted Chapter 21 of Title 15 to govern registration appeals. Among other things, the registration-appeal statute requires that a notice of appeal be in writing and "served personally or by registered mail, return receipt requested . . . ."[201] All required notices must be served "at least 5 days prior to the day on which the appeal or application is made to the court."[202] The statute also requires the appellant "to make and file . . . an affidavit that notice of that appellant's intention to present the appeal on the day was given to the Department or registration officers or both, and to the person affected by the appeal. . . ."[203] And the statute directs the court to give priority to appeals that remain "undetermined within 30 days before that date of the general election" and to "enter an order . . . on or before the tenth calendar day preceding the last registration day."[204]

---

[200] DEL. CONST. art. V, § 4

[201] 15 *Del. C.* § 2104(a).

[202] 15 *Del. C.* § 2104(b).

[203] 15 *Del. C.* § 2105.

[204] 15 *Del. C.* § 2106.

It is evident that the Same-Day Registration Statute is patently incompatible with this appeal regime. But, one might counter, a conflict between the Same-Day Registration Statute and the registration-appeal statute does not render the Same-Day Registration Statute unconstitutional. This would miss the point, however, which is that permitting voter registration up to and including the date of the election effectively eliminates the ability to conduct an orderly appeal process. Because Section 4 creates appeal rights and the Same-Day Registration Statute interferes with those rights, the statute violates Section 4.

The same can be said of the correction process. Section 4 provides that registrations "may be corrected as hereinafter provided *at any time prior to the day of holding the election*."[205] To state the obvious, an incorrect registration based on an application received on the day of the election will not be subject to correction under this provision. Again, the Same-Day Registration Statute clashes with the time-honored provisions of Section 4.

The Court of Chancery's answer to the charge that the Same-Day Registration Statute conflicts with Section 4's provision that "such registration[s] may be corrected . . . at any time prior to the day of holding the election" was that "'such registration' refers to registrations described in the immediately preceding passage

---

[205] DEL. CONST. art. V, § 4 (emphasis added).

and is silent as to registrations occurring on the day of the general election."[206] Under the Court of Chancery's reading, it seems to us, some registrations would be subject to correction and others would not. But this resolution of an otherwise clear conflict between the statute and Section 4 runs head-on into Section 4's uniformity requirement, imposed by the very first words of Section 4: "The General Assembly shall enact *uniform* laws for the registration of the voters in this State entitled to vote under this Article. . . ."[207]

In short, the Court of Chancery's indulgence of the presumption of the Same-Day Registration Statute's constitutionality goes too far. We read Section 4 as establishing a deadline for voter registration that will allow time for the appeal and correction processes to work. By enacting the Same-Day Registration Statute, which permits registration beyond that deadline, the General Assembly exceeded its legislative authority.

We also disagree with the notion that the 1925 amendment of Section 4 signaled the General Assembly's intention to eliminate the registration deadline. The original language of Section 4 provided for "biennial registration" that "shall be *commenced* not more than one hundred and twenty days nor less than sixty days

---

[206] *Higgin*, 2022 WL 4239590, at *16.
[207] DEL. CONST. art. V, § 4 (emphasis added).

before and be *completed* not more than twenty days nor less than ten days before such election."[208]  The 1925 amendment eliminated the "biennial registration" requirement in favor of a requirement of "at least two registration days in a period *commencing* not more than one hundred and twenty days, nor less than sixty days before, and *ending* not more than twenty days, nor less than ten days before, each General Election . . . ."[209]

The Court of Chancery chided Higgin for "fail[ing] to grapple with [the amendment's] unambiguous deletion of 'be completed' from the text."[210]  The court, it would seem, saw this deletion as removing the earlier version's registration deadline.  But the court appears to have disregarded the amendment's inclusion of substitute language that set the registration period as "ending" within the same temporal limitations as were applicable under the pre-amendment language—not more than twenty days nor less than ten days before the election.  At least as to the issue before us, the amendment's replacement of a registration period that is to be "completed" within a range of dates with one "ending" within that same date range lends no support to Court of Chancery's interpretation of Section 4.

---

[208] DEL. CONST. of 1897, art. V, § 4 (emphasis added), *quoted in Higgin*, 2022 WL 423950, at *18.
[209] DEL. CONST. art. V, § 4 (emphasis added).
[210] *Higgin*, 2022 WL 4239590, at *18.

Finally, we note that, although our conclusion that the Same-Day Registration Statute is incompatible with Section 4's registration deadline and its relationship to the appeal and correction process is textually driven, it is also consistent with the framers' intention "that the possession of the qualification of the right to vote should be settled and determined, not at the moment of election, but by the registration[,]"[211] and that "if the registration is to serve any purpose, it is to afford an opportunity of ascertaining the facts after deliberation and within a suitable period before the election."[212]

Although these passages were not cited in *Harrington*, they support the Court's conclusion in that case that "the qualification of voters should be determined before election day . . . ."[213] The Same-Day Registration Statute is at odds with that objective.

## V. CONCLUSION

Our decision—announced two months ago and explained in this opinion—is not intended to reflect the Court's views on the relative advantages and drawbacks of universal absentee voting or a later registration deadline. The resolution of those

---

[211] 2 CHARLES G. GUYER & EDMOND C. HARDESTY, DEBATES AND PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF DELAWARE 1101 (Milford Chronicle Publ'g Co. 1958) (1897).
[212] *Id.*
[213] *Harrington*, 30 A.2d at 691.

issues is within the General Assembly's province. The Court's role—indeed, our duty—is to hold the challenged statutory enactments up to the light of our Constitution and determine whether they are consonant or discordant with it. For the reasons discussed in this opinion, we conclude that the Vote-by-Mail Statute and the Same-Day Registration Statute violate the Constitution's relevant provisions and thus cannot stand. The changes to our election regime embodied in the challenged statutes must be effected, if at all, by constitutional amendment. Accordingly, the Court of Chancery's judgment as to the Vote-by-Mail Statute is affirmed; as to the Same-Day Registration Statute, it is reversed.